## Donald W. Record, et al v. State Highway Board

[154 A2d 475]

May Term, 1959.

Present: Hulburd, C. J., Holden, Shangraw, Barney and Smith, JJ.

Opinion Filed September 1, 1959.

*Fitts & Olson* for the appellants.

*Frederick M. Reed*, Attorney General, *Louis P. Peck*, Legal Assistant to the Attorney General, and *John S. Burgess* for the Highway Board.

**Shangraw, J.** This is a land condemnation case. The State, acting through the Vermont State Highway Board, pursuant to No. 242 of the Acts of 1957, now 19 V. S. A. Chapter 5, Condemnation, took by eminent domain a tract of land owned by the appellants, Donald W. Record, and his wife, June L. Record, hereafter referred to as the petitioners, and awarded the petitioners $27,000.00 damages. An appeal from the award was taken to the Windham County Court. Trial by jury was waived and the matter was heard by the court. The court made findings of fact and entered judgment thereon for the petitioners to recover $32,000. damages, and interest from June 17, 1958. The case is here on petitioners' exceptions: (a) to some of the findings of fact; (b) to the refusal of the court to find facts as requested; (c) to the admission of certain evidence; (d) to the failure of the court to strike certain testimony; (e) to the ruling of the court concerning damages; and (f) to the judgment.

The material facts as found, and unexpected to, are summarized as follows: The petitioners are proprietors of three trailer parks in the Brattleboro area. They first owned a trailer park of about 37 lots at West Brattleboro known as Glen Trailer Park. In October 1955 they purchased approximately sixteen acres of undeveloped land located about one-fourth mile westerly of the Putney road (U. S. Route 5) and easterly and northerly and below the grade of the so-called Black Mountain road. The petitioners developed a portion of this land into trailer sites or lots by building a gravel roadway and making other improvements. At the time of the taking, these improvements generally consisted of a water supply connected to the Village of Brattleboro water system, sewage facilities, sewage line emptying into a 5000 gallon septic tank, telephone service, electricity and gas available at each trailer lot. There was also a concrete block building, housing hot water heaters and washing machines for the use of the trailer park tenants. The taking bisects this building

and requires its removal. Petitioners presented no evidence of cost of the land. The estimated installation or construction costs (replacement costs) of the utilities, consisting of sewer line, water lines, riser tile, meter pit, septic tank and restoring the lawn sod, was found to be $12,207.14, and for the laundry or wash building the sum of $4,211. The gas line installation also cost $900. There has been little, if any, depreciation of the various utilities from the date of their installation in the trailer park to the date of the taking. This development was called Black Mountain Park. The most reasonable use of the property was for a house trailer park. The developed portion of the park was well laid out. At the time of the taking of a portion of the land by the State on June 17, 1958, there were fifty trailer lots developed and available for use, all of which were then rented and had been for several months previous thereto. The level land, horseshoe in shape, available for a trailer park, lays around a high knoll or ridge covered with growing trees and is an ideal location for a trailer park. Of the fifty developed trailer lots nine were southerly of the high knoll and forty-one were easterly thereof. At the time of the taking petitioners were receiving $18.00 per month from each trailer lot.

The Black Mountain Park land taken in fee by the State was 11.3 acres, which included all of the fifty trailer lots except nine lots located southerly of the high knoll. The use of all but four of these nine lots will be lost. There are about two to three acres of land easterly between the developed section of the park and the brook which were not developed into lots and without roadway and facilities. This land is within the taking by the State. Twenty-four trailer lots could reasonably have been placed in that location. Certain slope rights were also taken.

In August 1958, the petitioners opened a third trailer park in West Brattleboro, known as Mountain Home Park. Just before, or at the time of the taking, there were fifty trailer parking lots rented at Black Mountain Park and thirty-seven lots rented at Glen Park, at $18.00 per month. At the time of the hearing on October 28th and 29th, 1958, Mr. and Mrs. Record had ninety-seven trailer parking lots rented at their

three trailer parks, 29 at Black Mountain Park, 37 at Glen Park, and 31 at Mountain Home Park. The court found there were no other trailer parks in Brattleboro and vicinity, other than the three owned by the petitioners, except a small five lot area on the Putney road owned by other parties. The nearest trailer park is some miles away at Keene, New Hampshire.

The findings of fact to which exceptions were taken by the petitioners, briefed, and here considered are:

"(17) Since the taking on June 17, 1958, the petitioners have developed 25 trailer parking lots on the remaining land not taken by the state which is in the northwesterly area of the land owned by petitioners. The land not taken includes part of the high knoll. These trailer lots are larger than the 50 lots first developed so as to provide a space of between 45 to 55 feet rather than 32 to 35 feet between the trailers.

"(18) On the date of the taking by the State, the petitioners had no trailer lots developed and no trailer business established on the remaining land not taken except the nine lots mentioned in findings No. 6 and No. 12. (No. 6 refers to the 50 developed trailer lots, nine southerly of the high knoll, and 41 easterly thereof. No. 12 again relates to said nine lots, stating that petitioners will lose the use of all but about four of these lots.)

"(19) In August 1958, the petitioners opened up a third trailer park, (Mountain Home Park) in West Brattleboro on a 100-acre farm previously purchased by them for this purpose and for future development and expansion.

"(22) The petitioners have re-established their trailer park business lost by the taking of the 11.3 acres through and by the development of the new trailer lots on (1) the remaining land at Black Mountain Park and (2) the 100-acre farm in West Brattleboro, (Mountain Home Park). The displaced trailers were removed to these new lots.

"(23) The State did not take by condemnation either the trailer park business of the petitioners at Black Mountain Park or the profits derived therefrom.

"(24) The court is unable to find on the evidence in the case that the petitioners have lost to any extent, if at all, any business or profits as a direct or proximate result of the taking of the 11.3 acres.

"(26) There has been no decrease in the value of petitioners' trailer park business directly or approximately caused by the taking.

"(29) The fair market value of the petitioners' property before the taking, considering the value for the most reasonable use of the property and of the business thereon is $35,000.

"(30) The fair market value of the remaining land after the taking is $3,000.

"(31) The damages resulting to the petitioners from the taking of the 11.3 acres and slope rights considering the value for the most reasonable use of the property and of the business thereon and the direct and proximate lessening in value of the remaining property not taken and the business thereon is $32,000.

"(32) The sum of $32,000. is fair, just and adequate compensation to the petitioners for the damages directly and proximately resulting by the taking of their said property and rights therein by the State."

The petitioners, during trial, proceeded on the theory that damages in this case should be determined by the method of capitalization of net income. Certain requests for findings were filed by them and denied by the court. Those excepted to and briefed are summarized as follows: Nos. 25, 26, and 27 relate to the value of $45,000 placed on the developed lots in the Black Mountain Park by a 16% capitalization rate (6% interest and 10% return of capital). Nos. 29, 30, 31, and 32 concern evaluating the net income per year for capitalization purposes of the 49 undeveloped trailer sites at $144.50 per

site, a total of $7,090, applying a capitalization rate of 18½% (6% interest and 12½% return of capital) indicating an overall value for these undeveloped sites of $38,750, diminished by the cost of $11,270 for development, resulting in a net capitalized value of $25,831. No. 33 states that the reversion value of all of the petitioners' land at the end of ten years may be fairly determined at $6,139. No. 34 requests that the value of the remaining land consisting of nine developed lots and twenty-four undeveloped lots, and a portion of the road, be determined at $13,490. The value of the nine developed lots is nil because not usable for trailer sites. No. 35 pertains to a request that petitioners' damage to undeveloped locations within the land taken be determined at $18,526, or in round figures at $18,500. No. 36 requests that the total damage be determined at $63,500.

The petitioners, in their brief, present the following general grounds in support of their claims: (A) "The Court has failed to grant to the petitioners just, full, and adequate compensation for the damages resulting from the taking of the business on their premises and the direct and lessening in value of the business on their remaining property." (B) "The establishment of other sites for trailers displaced by the taking is not material to the assessment of damages for the taking of the business on the petitioners' premises." (C) "Where rental property is condemned damages are properly determined on the basis of capitalization of net income where statute directs recovery for business damages."

The controlling statute is No. 242 of the Acts of 1957, now 19 V. S. A. §221 (2) which in part reads as follows:

"II. Damages resulting from the taking or use of property under the provisions of this act shall be the value for the most reasonable use of the property or right therein, and of the business thereon, and the direct and proximate lessening in the value of the remaining property or right therein and the business thereon" * * *

In construing this statute we are not to presume that the legislature intended to work any change in the common law beyond what the statute itself declares in either express terms,

or by unmistakable implication.  *State* v. *Hildreth*, 82 Vt 382, 384, 74 A 71, 24 LRANS 551.

■ ■ Prior to this enactment our law measured damage by the market value rule.  This value was the difference between the value of the entire tract before the taking and its value thereafter.  *Essex Storage Electric Co.* v. *Victory Lumber Co.*, 93 Vt 437, 448, 108 A 426; *Nelson* v. *State Highway Board*, 110 Vt 44, 52, 1 A2d 689, 118 ALR 915; *Demers* v. *Montpelier*, 120 Vt 380, 387, 141 A2d 676.  In the Nelson case, *supra*, at page 53 the Court recognized that there are many injuries resulting from highway construction for which land owners cannot be compensated.  Mindful of these inequities the legislature quite clearly recognized that in some instances a business enterprise might be invaded and the yield of the business lessened or destroyed as a result of the taking of the land upon which the business is situated.  Thus it imposed the statutory function upon the trial court to look beyond the value of the improved real estate actually seized by the State and search out to what extent, if any, the business interests of the land owners were damaged.  It is only to the extent that a business is taken by the appropriation of the land on which it is situated that the legislature meant that compensation be paid.  A business may be inextricably related and connected with the land where it is located so that an appropriation of the land means an appropriation of the business.  More often, however, this is not the case and an appropriation of the land has but a limited effect on the business.  And this effect is not necessarily adverse.  Where an appropriation necessitates a relocation in whole or in part of the business, the question is what has, or would the business suffer by being transplated. The trial court was required to look at all the circumstances. A factual problem was presented, rather than a legal one.

We now refer to exceptions taken to the findings.  Findings Nos. 17 and 18 relate to trailer sites on land not taken; number 19 to the opening up of Mountain Home Park at West Brattleboro for further development; and number 22 to the effect that the trailer park business on the 11.3 acres of land taken was removed to this development at Mountain

Home Park. These findings are supported by the evidence and material. These exceptions are not sustained.

Finding No. 23 is to the effect that the State did not take the business at Black Mountain Park or the profits derived therefrom. This finding is supported by the evidence. The rental of trailer sites on the premises invaded was transferred to, or relocated on a different trailer park previously acquired by the business for this very purpose. The income and operation of the business was not injured by the taking. On the facts presented this case becomes one where only the land was taken. The successful relocation of the displaced trailer sites in itself bears evidence that the success of petitioners' enterprises was not inherently connected to the particular land appropriated. This exception is without merit.

Finding No. 24 logically follows. It is to the effect that the court was unable to find that the petitioners have lost to any extent, if at all, business or profits by the taking of the 11.3 acres of land. When considered in connection with finding number 26 that there has been no decrease in the value of petitioners' trailer park business, the court obviously has in mind the entire trailer park operations of the petitioners. In other words the overall business had not decreased.

■■ In the assessment of damage sustained by an integrated business enterprise as a result of the condemnation of a part of its real estate, it is proper and just to consider the overall effect on the entire operation. *Essex Storage Electric Co., Inc.* v. *Victory Lumber Co.*, 93 Vt 437, 446, 108 A 426. The petitioners sustained no damage to the business. We construe these findings in this light. The petitioners are only entitled to a fair equivalent in money's worth for their loss. *Brooklyn Eastern Dist. Terminal* v. *New York* (CCA 2d), 139 F2d 1007, 152 ALR 296. The problem is one of justice between the individual proprietor on the one hand and on the other hand the sovereign, or representative of sovereign power, *New York O. & W. R. Co.* v. *Livingston*, 238 NY 300, 144 NE 589, 591, 34 ALR 1078, 1081.

The petitioners urge that if they were fortunate in developing a like business at another place this cannot be used to

lessen or mitigate their business damage citing *Matter of Board of Water Supply (Bishop)* (1914), 211 NY 174, 105 NE 213. The facts in that case and the statute to which they were applied are different. Moreover the restrictive doctrine expressed in that case, as urged by the petitioners, is contrary to the concept expressed by this court in *Essex Storage Electric Co., Inc.* v. *Victory Lumber Co., supra*, at 446.

The ultimate findings Nos. 29, 30, 31, and 32 are unequivocal and are supported by rational evidence. A finding must stand if the record discloses evidence which, upon any rational view, supports it. *Bagalio* v. *Hoar*, 118 Vt 384, 388, 110 A2d 719; *Tower* v. *Tower*, 120 Vt 213, 138 A2d 603. The court exercised an independent and discriminating judgment, for in values it declined to follow exclusively the judgment of any single witness whose valuations ranged from $27,000 to a high of $77,000 before the taking and from $2,000 to $13,000 or about $13,500 after the taking. Since these findings on values and damages are within the range placed before the court by the various witnesses, they are supported by the evidence. *Latchis* v. *State Highway Board*, 120 Vt 120, 133, 134 A2d 191; *Jackson* v. *Rogers*, 120 Vt 138, 150, 134 A2d 620. Furthermore the findings should not be considered piecemeal. This Court is bound to construe findings of fact reasonably and they are to be read to support the judgment, if they reasonably may be. *Potter* v. *Clarendon*, 118 Vt 278, 279, 281, 108 A2d 394; *Scott* v. *Leonard*, 119 Vt 86, 98, 119 A2d 691. We construe these ultimate findings in this case as an overall determination on the part of the court of what petitioners were fairly entitled to receive as damages. Exceptions to these findings are without merit.

We now consider the petitioners' exceptions to requested findings denied by the court. The petitioners claim that, in the absence of any evidence of sales of similar property, the capitalization of income method presents the best available evidence, and that damages are properly determinable on this basis. These requests, in substance, relate to the capitalization of anticipated future income over a period of years from the developed and undeveloped land taken. They

urge that this is the best indication of market value in this case. We therefore treat these exceptions for failure to find collectively. In the determination of value there are various kinds of evidence or methods of proof which are generally accepted by the courts as relevant. The capitalization of income, under proper circumstances, appears to be an accepted method in arriving at values. No exact formula is available. *Demers* v. *City of Montpelier*, 120 Vt 380, 387, 141 A2d 676. The existence of a sale in the vicinity is not essential to the ascertainment of market value, and such value may be established by the testimony of people familiar with the property and its value, and with the uses to which such property may be put. *State Highway Commission* v. *Buchanan*, 175 Miss 157, 165 So 795, 166 So 537. Ordinarily this transferable value may be measured by the price which, in all probability, would voluntarily be agreed upon in fair negotiations between an owner willing (but not forced) to sell and a buyer willing (but not forced) to buy; and it is this price which is generally said to determine the fair amount of compensation to be paid to the owner. *East Ridgelawn Cemetery* v. *Winne.*, 11 NJ 459, 469, 94 A2d 833. No hard-and-fast rule may be laid down applicable to every case as to what elements properly enter into consideration in determining the market value of property sought to be condemned.

The petitioners claim damage of $63,500, and relying on the capitalization of income method introduced expert testimony in support of this theory. The State countered by improving as witnesses C. Russell Little, Premo Ratti, and George Clendaniel, all real estate appraisers. Mr. Little testified that he had knowledge of the net income from the trailer sites on the developed portion of the property taken and in making his appraisal looked upon the matter "as a typical buyer would do." This witness valued the property with the business thereon before the taking at $27,000 and after the taking at $2,000. He was present in court during the trial and expressed his opinion on values based upon his observations, inspection and study of the property, and on testimony heard in court. Petitioners moved to strike his testimony because of its improper basis for the valuation of petitioners'

property and business thereon. The objection goes to the weight and not to its admissibility. This exception is not sustained.

Mr. Ratti testified that the fair market value of the property with business thereon was $31,150 and that the remaining land was worth $3,500. He had knowledge of its income and took into consideration that it was an established business, a good sound operation, and was operated at a profit. He considered sales of land in the vicinity and that this was only one factor in the values placed on the land before and after the taking. The objection to the testimony of this witness on the ground that sales of land alone were not sufficient evidence is without merit. This exception is not sustained.

Further expert evidence was introduced by the State to the effect that the capitalization of income method was too speculative in this case to reach a definite value. The property with business thereon was valued at not to exceed $33,000 before the taking, and the remaining land at $3,000.

The petitioners took exceptions to the following statement made by the Court during the early part of the trial.

> "Once again the Court will say it is not the business profits, loss of income and that sort of thing which enters into the picture here as making up the damage. It is the value of the land for its most reasonable use and of the business thereon before and after the taking. What was taken and what was remaining and any damage to the business itself is not an element of damages and the Court will so find and so rule."

Before and after this statement was made the court permitted the introduction of evidence on the petitioners' theory of valuation, that is the capitalization method, and in its findings and award followed the language of the statute. This remark of the Court was addressed to the plaintiffs' theory of capitalization of income. It is apparent that the Court considered, in this case, that business profits were not the subject of independent compensation apart from the land itself. In this we find no error. In arriving at the sum of $32,000 by way of damages resulting in the taking of the 11.3

acres and slope rights, the Court in finding No. 31 considered * * * "the value for the most reasonable use of the property and of the business thereon and the direct and proximate lessening in value of the remaining property not taken and the business thereon" * * * . This follows the mandate of the statute. By refusing to find as requested it is apparent that the Court took the view that the nature of the venture was too uncertain and speculative to justify a valuation based only upon the petitioners' theory of capitalization of income in assessing damage.

*The judgment is supported by the facts as found. No error appears. Judgment affirmed.*