**CITY OF ST. LOUIS, Respondent,**

**v.**

**UNION QUARRY & CONSTRUCTION COMPANY et al., Appellants.**

**No. 50773.**

Supreme Court of Missouri.

Division No. 1.

Sept. 13, 1965.

Motion for Rehearing or for Transfer to Court En Banc Denied and Opinion Modified on Court's own Motion Oct. 11, 1965.

Thomas F. McGuire, Acting City Counselor, Andrew J. Reis, Associate City Counselor, St. Louis, for respondent.

Shaw, Hanks & Bornschein, by Claude Hanks, Clayton, for appellants.

HOUSER, Commissioner.

This is a proceeding by City of St. Louis to condemn for park purposes land in the city consisting largely of an abandoned rock quarry being used by its owners, Union Quarry & Construction Company, Walter and R. Nick Skrainka, as a private dump. Commissioners awarded landowners $35,916.57. Trial of exceptions before a judge of the circuit court, sitting without a jury, resulted in a finding of damages in the same sum, $35,916.57, and a judgment affirming the report of the commissioners. Since landowners claimed damages in the sum of $83,500 and offered evidence in support thereof, we have jurisdiction of this appeal as the amount in dispute exceeds $15,000. State ex rel. Kansas City Power & Light Co. v. Salmark Home Builders, Inc., Mo.Sup., 350 S.W.2d 771; State ex rel. State Highway Commission v. Howald, Mo.Sup., 315 S.W.2d 786; Constitution, Art. V, § 3, V.A.M.S.; § 477.040, V.A.M.S.

The first question is whether the court erred in denying landowners a jury trial. This proceeding was instituted under the provisions of Art. XXI, § 3 of the Charter of the City of St. Louis, which provides that "Any party entitled to and desiring trial by jury of its rights to compensation shall file in the cause, before the assignment of the commissioners in each case, written demand therefor, including therein a description of its property to be taken or damaged, and failure so to do shall be a waiver of the right of trial by jury." Landowners did not file a written demand for a jury before the assignment of commissioners. Instead, they filed a motion for trial by jury on July 21, 1962, after the report of the commissioners was filed, after the amount of the award was paid into the registry of the court, and after the deposit had been paid to the landowners, less the amount due the collector for delinquent taxes.

Landowners claim that they have a constitutional right to a trial by jury, Constitution, Art. 11, § 4; that there was no issue for trial by a jury until exceptions to the report of the commissioners were filed, and that their request, made shortly thereafter, was timely; that the charter provision requiring a request for a jury trial before the assignment of commissioners is illogical and unconstitutional, under Constitution, Art. 11, § 4, which preserves inviolate the right to trial by jury in all trials of claims for compensation when the rights of any cor-

poration are affected by any exercise of the power of eminent domain.

This precise point has been ruled adversely to the contention of landowners in several cases. As late as November 13, 1961 this Court handed down the en banc decision of City of St. Louis v. International Harvester Co., Mo.Sup., 350 S.W.2d 782, 785, et seq., [4, 5], in which § 3 of Art. XXI was upheld on the ground that reasonable regulations and conditions may be made prerequisites for a jury trial, and unless a party to a suit complies with such regulations waiver of a jury trial may result. Three cases were cited in which it has been ruled that unless a request for a jury is timely made under this charter provision the right thereto is waived. 350 S.W.2d, l. c. 786. On the basis of these decisions this point is ruled against landowners without further comment.

The next question is whether the court erred in sustaining the commissioners' award of damages. Landowners complain that the commissioners (and the circuit court) did not use the proper basis in arriving at the damages; that in fixing the market value of the condemned property (a hole in the ground used as an income-producing public dump) commissioners and court did not take into consideration the unique character of the land in question and its adaptability to its highest and best use, but employed an improper standard of value, namely, evidence of sales of an entirely different kind of property (lands in the area suitable for use as *residential* property).

 This proceeding having been instituted under the Charter of the City of St. Louis (Art. XXI, §§ 3 and 7), the report of the commissioners has the effect of a jury verdict, is presumptively valid, stands and may not lawfully be set aside until the exceptor meets the burden of introducing sufficient substantial evidence to establish that the report was wrong in point of law or matter of fact. City of St. Louis v. Pandjiris Weldment Co., Mo.Sup., 270 S.W.2d 17. Landowners excepted to the

commissioners' report on two grounds: (1) that the award was grossly inadequate; (2) that in determining the amount of the damages the commissioners proceeded upon erroneous principles of law and refused to consider proper elements of value and damages. An exception based upon the excessiveness or inadequacy of the award ordinarily involves a determination whether the circuit court abused its discretion or acted arbitrarily in sustaining the commissioners' report. City of St. Louis v. Pandjiris Weldment Co., supra. Something more than a review of an exercise of discretion is involved on this appeal, namely, the determination of a question of law: whether the commissioners (and the circuit judge) applied the proper standards of value under the particular facts and circumstances of this case.

The facts are that the property was operated as a quarry until 1935, after which it was used as a public dump. In 1948 the city passed an ordinance requiring the owners to obtain a permit and (apparently) restricting the material to be dumped to noncombustibles. The owners obtained permits each year, and continued the operation as a private dump until the date of condemnation, June 27, 1962. They employed a manager, who kept books and complete records. A charge was made for dumping, $1 per truckload. Records for the 16 years preceding the taking show that an average of 20,000 truckloads of dirt and noncombustible material were dumped each year. Loads averaged 5 cubic yards. Landowners thus grossed $20,000 annually, on the average, from this operation. The quarry was only partially filled as of the date of the taking. Calculations show that as of that date it would have taken 625,000 cubic yards of material to fill the hole so as to make it level with surrounding land, taking into account the factor of compaction. Figuring that they were handling about 100,000 cubic yards per year of uncompacted rubbish the hole would have been filled, not considering compaction, in something over 6 years; with compaction, it would

take 10 or 11 years. Prior to the date of taking the owners sold some property adjoining the quarry (property suitable for use as building lots) for 20¢ per square foot.

There are no other unfilled quarries or unfilled holes in the vicinity, and there have been no sales of quarries in recent years.

Landowners intended to continue their operation until the quarry was filled, then sell the land to A & P Company or Shell Petroleum for parking spaces or to the city for park purposes.

Landowners produced the testimony of two experienced and thoroughly qualified experts, John Doerr and Stephen Thornton, who appraised the quarry property at $75,000 and $83,500, respectively. Using the method of capitalization of income, Mr. Doerr took the stream of income of approximately $20,000 per year reasonably to be expected for a period of 11 years, applied a discount factor to yield a present value of $64,950 to which he added the present worth of the property for use as building lots ($33,500 figured at 20¢ per square foot), discounted to yield a current market value of $11,741. The sum of these two figures, i. e. the present worth of the income stream plus the reversionary value of the land at the end of the income period, produced the appraisal figure of $75,000 (rounded out figures). This was based upon a 10% rate of discount. Whereas a discount rate of 6% is normal, the more conservative 10%, which produces a lower value, was used by Mr. Doerr because he considered that it reflected a truer value in this case. These estimates were based upon a detailed analysis of the income and actual expenses for the 5 years preceding condemnation. Mr. Doerr considered that $75,000 was the value of the property at its highest and best use; that this is what a well-informed buyer would be justified in paying and an informed seller would be justified in receiving.

Mr. Thornton also used the capitalization of income method. He arrived at the appraisal figure of $83,500 as follows: He figured the value of the land if sold as residential property at $33,500, based on 20¢ per square foot after the hole would be filled in. Discounted back to present worth this figures $18,000. Investigation of the market on the dumping of noncombustible refuse revealed that the going rate would average about 30¢ a cubic yard. He calculated annual gross receipts of $18,750 based on 30¢ per cubic yard. He calculated expenses of $9,950, with net earnings of $8,800 per year. Figuring that the pit would be filled up in 10 years, using a 6% discount rate, he arrived at a present worth of the income stream of 10 years of $64,768. This, rounded out, plus the $18,000 above, added up to $83,500 present discounted value of the property at its highest and best use.

The city's expert, Charles W. Herold, also thoroughly experienced and qualified, valued the property at $31,700. He took into consideration that the adjoining property sold at about 20¢ per square foot. He stated that the property condemned consisted of 3.818 acres, of which 1.84 acres were filled in to the level of the street; that the 1.84 acres were worth 25¢ per square foot, or $12,893.76; that the remaining 2.634 acres, which was a hole, was worth $6,000 per acre, or $15,804. The balance of the $31,700 he allowed as the value of fencing on the property. He regarded the highest and best use of the property as single residential family. He based his opinion that the value of the hole was $6,000 per acre on his experience, which he admitted might be said to be his guesswork. He said he was not permitted to consider what type of business was operating there, whether it was a profitable or a losing business.

■ This judgment must be reversed because the commissioners and court used an improper and worthless datum base for the valuation of the 2.634 acres. It is obvious that these bodies, while admitting and purporting to consider the evidence in support of the income approach, actually and in

fact ignored and rejected the evidence of the highest and best use of the 2.634 acres. Accordingly, the cause must be remanded for further proceedings consistent with this opinion.

■■■■ The ultimate objective in this case, as in all condemnation cases, is to enforce the constitutional mandate "That private property shall not be taken or damaged for public use without just compensation." Constitution, Art. I, § 26. "Just compensation" means the full and perfect equivalent in money of the property taken, Clark v. United States, 8 Cir., 155 F.2d 157, but no more, for to award more than the value of the condemned property would result in the unjust enrichment of the condemnee. State ex rel. State Highway Commission v. Hackett, Mo.App., 370 S.W.2d 712. The "just compensation" referred to, generally speaking, is the "fair market value" of the property at the time of the taking. Union Electric Co. v. Saale, Mo.Sup., 377 S.W.2d 427 [1]; Union Electric Co. v. Pfarr, Mo.Sup., 375 S.W.2d 1; 4 Nichols on Eminent Domain, 3rd ed., § 12.2. The fair market value of land is what a reasonable buyer would give who was willing but did not have to purchase, and what a seller would take who was willing but did not have to sell. Union Electric Co. v. Saale, supra, 377 S.W.2d, l. c. 429. The landowner is entitled to the fair market value of the land at its highest and best use, City of St. Louis v. Vasquez, Mo.Sup., 341 S.W.2d 839; and in determining what constitutes the fair market value the uses of the land for which it is reasonably adapted or suited may be considered, including a special adaptation for a particular use, North Kansas City School Dist. of Clay County v. J. A. Peterson-Renner, Inc., Mo.Sup., 369 S.W.2d 159, 164, having regard to the existing business wants of the community. Union Electric Co. v. Saale, supra. If such peculiar adaptation adds to its value, the owner is entitled to the benefit of it. 29A

C.J.S. Eminent Domain § 160. In determining fair market value each case must be considered in the light of its own facts, not on the basis of some artificial rule, but of sound judgment and discretion on a consideration of all relevant circumstances. 29A C.J.S. Eminent Domain § 136(5).

The circumstances of this case are unique and different. This property is a special situation. It is principally an abandoned quarry, a hole in the ground. Because of the business wants of the community (the pressure for a place to dump refuse in a densely populated metropolitan center) the abandoned quarry has been converted temporarily into a landfill project,—a use different from that of an abandoned quarry; obviously a higher, better and more profitable use—an income-producing dumping ground, which when filled will be adaptable for another use, as a parking space or for park purposes. Many of the factors ordinarily considered in determining market value of real estate, such as the price at which the land was recently bought, the price at which similar and comparable land in the vicinity has sold at or about the time of the taking, other uses for which the land is now or in the immediate future will be adaptable or available, and the cost of improvements which increase the market value of the land, 4 Nichols on Eminent Domain, 3rd ed., § 12.31 [2], are nonexistent or inapplicable to the 2.634 acres.

■■■■ In this unique situation, where the usual criteria are absent; where the land is devoted to the *only* apparent use to which it could be most advantageously and profitably applied, 4 Nichols on Eminent Domain, 3rd ed., § 12.31 [2]; where the character of the property is such that a profit is produced by the property itself without the labor of the owners being expended hereon,[1] and where the profits derived from its use are the chief source of its value, evidence of such profits was properly admitted and is relevant as a criterion of the

---

1. The operation not requiring any considerable skill, wisdom, ingenuity or labor on the part of the owners.

value of the property. Idem, §§ 12.312 [1]; 13.3 [2], fn. 34, p. 450.

■ This announcement is not in derogation or repudiation of the general rule that business profits are ordinarily not admissible evidence of the value of the land on which the business is located. We adhere to that rule, as announced in this state many times. St. Louis Housing Authority v. Bainter, Mo.Sup., 297 S.W.2d 529, 534 [6], citing City of St. Louis v. St. Louis, I. M. & S. Ry. Co., 266 Mo. 694, 182 S.W. 750; Tate v. State Highway Comm., 226 Mo.App. 1216, 49 S.W.2d 282 and City of St. Louis v. Paramount Shoe Mfg. Co., 237 Mo.App. 200, 168 S.W.2d 149. And see 1 Orgel on Valuation under Eminent Domain § 162; 2 Lewis, Eminent Domain, 3rd ed., § 727. A reason often given for the rule is that evidence of profits derived from a business conducted on property is too speculative, uncertain, and remote to be considered as a basis for computing or ascertaining the market value. Accomac Realty Co. v. City of St. Louis, 347 Mo. 1224, 152 S.W.2d 100, 102. And see Shelby County R–IV School Dist. v. Herman, Mo., 392 S.W.2d 609 (decided July 12, 1965).

■ The general rule, however, must be given an exception *ex necessitate* in this case, where the business is inextricably related to and connected with the land where it is located, so that an appropriation of the land means an appropriation of the business[2]; where the evidence of net profits apparently is clear, certain and easily calculable, based upon complete records; where past income figures are relatively stable, average and representative, and future projections are based upon reasonable probability of permanence or persistence in the future, so that conjecture is minimized as far as possible,[3] and where the body fixing the damages would be "at a loss to

make an intelligent valuation without primary reference to the earning power of the business." Orgel, supra, § 162, p. 655. For other reasons the variables are reduced to a minimum in this case. The period during which the income stream will continue to flow is fairly predictable. Many factors of uncertainty present in other types of cases are absent here: yields, weather, markets, supply and demand, uncertain fluctuations of labor costs, etc.

A comparable situation was encountered in the condemnation for a public park of Goat Island and Prospect Park, above Niagara Falls. On the matter of income from the premises the commission adverted to the general rule that the profits of a business transacted upon the condemned premises (in that case from charging admission to sight-seeing visitors) are not legitimate evidence of value, but felt compelled to consider and accord due weight to the evidence of income, by the absence of proof of market value. The commission referred to the necessity of being satisfied that the net income "has the element of permanency," and that the income was derivable from the property itself and not from the skill of the management of the property, or advertising, and the capitalization of income method was given major consideration in arriving at the damages. Matter of State Reservation at Niagara, 16 Abb.N.C. (N.Y.) 159, l. c. 195, 198, 199, affirmed 37 Hun 537, 16 Abb.N.C. (N.Y.) 395.

It would not be fair or proper to fix the market value of this property on the basis of its value as an abandoned quarry, because it is being operated in another capacity, as an income-producing venture of another kind. This increases its market value, and is a factor to be considered. The converse of this situation is seen in

---

2. Record v. Vermont Highway Board, 121 Vt. 230, 154 A.2d 475, 480.

3. Shelby County R–IV School Dist. v. Herman, supra. The everdecreasing space available practically insures a continuous and persistent demand for the service offered, according to the evidence.

State ex rel. State Highway Commission v. Cox, 336 Mo. 271, 77 S.W.2d 116, where a strip of land along the side of a nonoperating quarry was condemned, and where the quarry was not being used for some other purpose. It was held that the refusal of an instruction offered by the landowner that the jury should not consider the fact that the quarry was not being operated was not error; that that fact may have had an effect (a depressing effect in that case) on its market value; that if the operation ceased because the business or wants of the community did not justify its operation, "it most certainly must have affected its market value." 77 S.W.2d l. c. 119.

Comparable to the income from this dump is rental income from rent-producing properties, consideration of which is recognized as a means of determining actual market value. St. Louis Housing Authority v. Bainter, supra, 297 S.W.2d l. c. 535 [9]. See State ex rel. State Highway Commission v. Flynn, Mo.App., 263 S.W.2d 854 [13] for a direct holding that rental income is proper as a possible *capitalization factor* to assist in the determination of actual market value.

■■■■ The principle of capitalization of income in proper cases in the field of condemnation, and the application of a discount factor to arrive at present worth, has been recognized by this court. Land Clearance for Redevelopment Corporation v. Doernhoefer et al., Mo.Sup., 389 S.W.2d 780 (decided May 10, 1965). See 29A C.J.S. Eminent Domain § 168(2). This is a proper case for the use of the capitalization method and the application of a discount factor in fixing fair market value. For the reasons given for the admissibility of evidence of net profits, the capitalization of the net income from this property is "not merely a relevant datum for the valuation of the property but [is] the best available measure of its value," 1 Orgel on Valuation under Eminent Domain § 157, and apparently the only usable method. 29A C.J.S. Eminent Domain § 168(2), fn. 33.70, p. 725.

The judgment is reversed and the cause remanded to the circuit court with directions to order a new assessment by the commission or by three alternate commissioners, under the provisions of Art. XXI, § 7 of the Charter of the City of St. Louis, with instructions that as to the 2.634 acre tract they include in the assessment of benefits the worth of the net income stream as of the date of the taking, after applying a proper discount factor, plus the fair market value of the property at the end of the income period, properly discounted to the value as of the date of the taking, and any other necessary and appropriate instructions not inconsistent with the views expressed in this opinion.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HYDE, P. J., and HOLMAN and HENLEY, JJ., concur.

DONNELLY, J., not participating because not a member of the Court when the cause was submitted.