The BI–STATE DEVELOPMENT AGENCY OF the MISSOURI–ILLINOIS METROPOLITAN DISTRICT, Plaintiff/Appellant,

v.

AMES REALTY COMPANY, et al., Defendants/Respondents.

No. ED 89738.

Missouri Court of Appeals, Eastern District, Division Two.

July 22, 2008.

James W. Erwin, Mary M. Bonacorsi, Pamela J. Meanes, Brian C. Stone, St. Louis, MO, for appellant.

Robert Denlow, Paul G. Henry, Clayton, MO, Donald S. Singer, Scott A. Schatzman, St. Louis, MO, for respondents.

LAWRENCE E. MOONEY, Presiding Judge.

The plaintiff, Bi–State Development Agency of the Missouri–Illinois Metropolitan District, appeals from the judgment entered in its condemnation action by the Circuit Court of St. Louis County, following a jury verdict awarding damages to the defendant, the agents/trustees of Ames Place Subdivision. The jury assessed damages totaling $810,000 for the two University City properties, in which Bi–State acquired fee simple and easement interests in connection with construction of its light-rail extension project. On appeal, Bi–State claims that the trial court erred in finding that the defendant subdivision, rather than the City of University City ("the city"), owned the land referred to at trial as the "Green Space," that the trial

court erred in admitting evidence of the Green Space's value based on the across-the-fence appraisal methodology, and that the trial court erred in excluding evidence of special benefits to the subdivision. We conclude that Bi–State lacks standing to appeal the finding of the subdivision's ownership of the Green Space and that, in any case, such appeal is untimely. We also find no abuse of discretion concerning the evidentiary issues. Therefore, we affirm the trial court's judgment.

Bi–State filed a petition for condemnation of two University City properties, referred to throughout the proceedings as "University Drive" and the "Green Space." University Drive is a private street within the subdivision. The Green Space was a strip of common ground, measuring approximately thirty feet by 2,400 feet and running the length of the subdivision's southern boundary. Planted with trees and grass, the Green Space served as a buffer between University Drive and a public thoroughfare, which borders the subdivision to the south. The petition sought permanent easements for some areas and the fee for other areas of the two properties. The trial court entered its amended order of condemnation and appointed commissioners in January 2003. The subdivision filed a motion to apportion and distribute the commissioners' award for the condemned properties some twenty months later. No party responded to the motion. At a hearing in October 2004—at which hearing only the subdivision appeared—the trial court heard the subdivision's evidence of its ownership of the properties. The court then entered judgment, ordering payout of one hundred percent of the commissioners' award to the

subdivision for the condemned University Drive and Green Space properties. No party appealed the judgment.

The theory that the city might own the Green Space emerged in the summer of 2005. In January 2006, Bi–State filed a motion for partial summary judgment as to the Green Space or, alternatively, to vacate the amended condemnation award and/or reconsider the distribution of the commissioner's award. The trial court allowed the city to join in Bi–State's motion.[1] After hearing the motion and considering the evidence before it, the trial court denied the joint motion of Bi–State and the city, concluding that the subdivision owned the Green Space as of the date of taking. A trial on the exceptions followed, and the jury awarded the subdivision damages in the amount of $85,000 for the University Drive taking and $725,000 for the Green Space taking. Bi–State appeals.

■ In its first point, Bi–State claims the trial court erred in finding that the subdivision, rather than the city, owned the Green Space because, according to Bi–State, the subdivision made a common-law dedication of the Green Space to the city. Bi–State argues that it was aggrieved by the trial court's finding, and consequently the court's refusal to vacate the orders of condemnation and distribution, because Bi–State is now subject to a $725,000 judgment requiring payment to the subdivision for property that allegedly it did not own. Bi–State also maintains that if the city is the true owner of the Green Space, then Bi–State is statutorily prohibited from condemning the property without the city's agreement, pursuant to section 70.370 RSMo. (2000).[2] The city did not partici-

1. Bi–State does not explain why it took so long to assert that the city owned the Green Space or why the city failed to pursue the issue sooner.

2. All statutory references are to RSMo. (2000) except as otherwise indicated. Bi–State also never reveals why it now seeks to vacate a condemnation judgment, which it had sought,

pate in the trial of the exceptions nor is the city a party to this appeal.

Bi–State's claim of error challenges the court's distribution determination. We deny Bi–State's claim for two distinct reasons. First, Bi–State is not aggrieved by the distribution determination and thus lacks standing to appeal. Furthermore, even if Bi–State were aggrieved, its appeal of this issue is untimely.

■ Section 523.053 sets forth the procedure for distributing the condemnation award among defendants claiming a determinable interest in the proceeds of the award. Upon filing of either an agreement made among the defendants or a motion for distribution, the court shall determine the percentage of the award to which each party having an interest therein is entitled. Section 523.053. The trial court's determination of the interests in the condemnation award is considered a final, appealable judgment. Section 523.053.2; *State ex rel. Missouri Highway and Transp. Comm'n v. Quiko*, 923 S.W.2d 489, 492 (Mo.App. S.D.1996); *St. Louis County v. Boatmen's Trust Co.*, 857 S.W.2d 453, 455 n. 8 (Mo.App. E.D.1993); *City of Columbia v. Baurichter*, 684 S.W.2d 903, 905 (Mo.App. W.D.1985)(*Baurichter I*); *State ex rel. State Highway Comm'n v. Carlie*, 487 S.W.2d 873, 875 (Mo.App.St.L.Dist.1972). It is an ancillary but separate proceeding that is separately appealable. *Bi–State Dev. Agency of Missouri–Illinois Metropolitan Dist. v. Nikodem*, 859 S.W.2d 775, 776 n. 1 (Mo.App. E.D.1993). The determination of shares in this proceeding is final, regardless of future developments in the case. *Baurichter I*, 684 S.W.2d at 905.

■ The condemnor is entitled to notice of the filing of any agreement or motion and may have the right to intervene as an interested party in the proceedings. Section 523.053.1. The condemnor's right to intervene exists to ensure that the court considers and determines, prior to distribution, the interests of persons having an actual or beneficial interest in the property. *State ex rel. Behle v. Stussie*, 826 S.W.2d 71, 72 (Mo.App. E.D.1992). However, the condemnor need not determine the respective rights of the various defendants. *City of Columbia v. Baurichter*, 713 S.W.2d 263, 266 (Mo. banc 1986)(*Baurichter II*). "The condemnor is not concerned with the rights of rival claimants to the award because the fund deposited in the court is substituted for the property taken in condemnation." *State ex rel. State Highway Comm'n v. Chicago B. & Q. R.R. Co.*, 539 S.W.2d 760, 762 (Mo.App.K.C.Dist.1976)(quoting *State ex rel. State Highway Comm'n v. Paul*, 368 S.W.2d 419, 423 (Mo. banc 1963)).[3]

■ Persons having or claiming an interest in the distribution may appeal the trial court's judgment. *Behle*, 826 S.W.2d at 72–73. "The right of appeal exists solely by virtue of statute." *Id.* at 73. Section 523.053.2 grants the right of appeal to "[a]ny party aggrieved of the determination of interests made by the court" in a condemnation action. For a party to be "aggrieved," the judgment must operate prejudicially and directly on the party's personal or property rights or interests,

and replace it with a judgment that might foreclose condemnation of the affected parcels.

**3.** We do not consider the city a claimant to the award at this point. Immediately after the trial court concluded, for the second time, that the subdivision owned the Green Space, the city's governing council resolved that the city should take no more action in the case without first obtaining the city council's approval. It appears that the city has not since participated in the case.

and such effect must be immediate, not merely a possible remote consequence. *Shelter Mut. Ins. Co. v. Briggs,* 793 S.W.2d 862, 863 (Mo. banc 1990); *Behle,* 826 S.W.2d at 73. Generally, a judgment that affects or determines rights in property does not aggrieve a party who neither has nor claims an interest in or title to the property. *Chicago B. & Q.,* 539 S.W.2d at 762.[4] We hold that Bi–State lacks standing to appeal the trial court's determination of the interests in the Green Space because Bi–State is not thereby aggrieved.

■ The right to intervene pursuant to section 523.023.1 is not synonymous with being an aggrieved party for purposes of appeal under section 523.023.2.[5] *See Behle,* 826 S.W.2d at 72–73. In *Behle,* the condemnor appealed distribution of the commissioners' award, claiming that it was an aggrieved party. *Id.* at 72. The defendant landowners sought a writ of prohibition wherein this Court held that the order of distribution did not operate prejudicially or directly on the condemnor's property rights or interests, and so the condemnor was not an aggrieved party with the right to appeal. *Id.* at 73. This Court explained that only persons claiming an interest in the distribution have the right to

appeal. *Id.* at 72–73. "The interests of the [condemnor] are fully protected by the trial court's final order determining the parties who may legally share in the distribution of the deposited funds. It has no further interest in the order of distribution." *Id.* at 73.

Bi–State cites *State ex rel. State Highway Comm'n v. DeMarco,* 422 S.W.2d 644 (Mo.1968), to support its contention that it is aggrieved and has standing to contest the court's determination that the subdivision owned the Green Space. Bi–State's reliance on *DeMarco* is misplaced. In *DeMarco,* the condemnor discovered that it already owned the property it sought to condemn. 422 S.W.2d at 646. The Court held that the defendants were not entitled to the condemnation proceeds, *id.* at 649, but the condemnor in *DeMarco* was aggrieved by a judgment requiring it to pay for property it already owned. That is not the case here. It is undisputed that Bi–State did not own the Green Space prior to the condemnation proceedings and that Bi–State would be obligated to pay for its taking of the property. In this case, Bi–State claims that it is aggrieved because it should not have to pay one defendant as opposed to another defendant. But "[t]he

**4.** "It is highly doubtful that [the condemnor] is aggrieved by the court's order of apportionment in the sense that it has suffered a pecuniary loss as the result of the order." *Chicago B. & Q.,* 539 S.W.2d at 762. The Court treated the condemnor "as an aggrieved party only in the sense of its entitlement at a later trial to introduce evidence that [the defendants] owned less than a fee simple." *Id.* The Court affirmed the trial court's judgment excluding evidence disparaging the defendants' ownership. *Id.* at 764.

**5.** We are aware of the Supreme Court's decision in *Baurichter II,* where the Court stated that by dismissing the condemnor's appeal for lack of standing, the Western District overlooked the impact of section 523.053.1, which grants the condemnor standing to intervene

in apportionment proceedings. 713 S.W.2d at 267. The Supreme Court offered neither elaboration nor analysis in connection with this statement nor did it examine whether the condemnor was, in fact, aggrieved by the distribution order. The Western District's subsequent decision in *City of Columbia v. Baurichter (Baurichter III )* reveals that the Western District dismissed the earlier appeal on the basis that the condemnor "lacked standing to intervene as an interested party." *Baurichter III,* 729 S.W.2d 475, 476 (Mo.App. W.D. 1987). Furthermore, in *Baurichter III,* the condemnor appeared to seek the condemnation proceeds for itself. *Id.* at 483 ("The City alleges public policy requires the proceeds pass to the successor public entity."). This distinguishes *Baurichter* from our case.

condemnor is not concerned with the rights of rival claimants to the award. . . ." *Chicago B. & Q.,* 539 S.W.2d at 762.

■ The trial court in this case twice accepted evidence concerning the ownership of the Green Space, and the city joined in Bi–State's efforts to have the court vacate and/or reconsider the original distribution judgment. The record reveals that the trial court fully considered the interests of the city in the Green Space, but concluded that the subdivision was the sole owner of the property as of the date of taking. Bi–State's right of intervention pursuant to section 523.053.1 was satisfied because the trial court considered and determined all ownership interests in the Green Space. *Behle,* 826 S.W.2d at 72.

The right to appeal set forth in section 523.053.2 is of no aid to Bi–State. The statute's language applies to a party aggrieved by having its interest determined to be too small or rejected altogether. Bi–State has no standing to appeal this issue because it is not "aggrieved" within the meaning of section 523.053.2. The distribution determination does not operate prejudicially or directly on Bi–State's property rights or interests. Furthermore, Bi–State is protected because the doctrine of *res judicata,* or claim preclusion, prohibits the city from relitigating this issue. *See Kesterson v. State Farm Fire & Cas. Co.,* 242 S.W.3d 712, 715 (Mo. banc 2008). As a result, the city is in no position to challenge either Bi–State's condemnation or the subdivision's ownership as of the date of taking.

■ Yet a second factor precludes Bi–State from prevailing on this point. Even if Bi–State were aggrieved by the distribution determination, its current appeal is untimely. Because the trial court's distribution is a final, appealable judgment pursuant to section 523.053.2, that determination became a final judgment on November 4, 2004, thirty days after its entry on October 5, 2004. *See* Rule 81.05(a)(1). In this case, no party appealed the distribution determination. More than a year later, however, Bi–State sought reconsideration. Bi–State's motion asserted that the city was the true owner of the Green Space and cited Rule 74.06(b)(4), which provides for relief from final judgment.

■ A motion filed pursuant to Rule 74.06(b) to set aside a judgment is an independent action when it is filed after the underlying judgment becomes final. *See Waller v. YMCA of Greater St. Louis,* 120 S.W.3d 277, 278 (Mo.App. E.D.2003); *see also Yanuzzi v. Director of Revenue,* 14 S.W.3d 618, 620 (Mo.App. E.D.1999). Here, Bi–State filed its motion to reconsider the distribution determination more than a year after the distribution became final. Therefore, as to the portion of Bi–State's motion that sought relief from the distribution determination, it was an independent action. *See Waller,* 120 S.W.3d at 278. Any appeal would have been from the judgment disposing of the Rule 74.06 motion rather than the underlying final judgment. *The Bank v. Lessley,* 240 S.W.3d 739, 743 (Mo.App. S.D.2007).

Because Bi–State's motion was an independent action as it pertained to the trial court's distribution order, the trial court's denial of Bi–State's motion constituted a separate, appealable judgment. Bi–State did timely appeal this judgment, but then voluntarily dismissed its appeal prior to adjudication. Notwithstanding the question of whether Bi–State was aggrieved by the distribution of the condemnation proceeds, Bi–State's dismissal of its appeal foreclosed timely review of the distribution determination. We deny Bi–State's first point.

In its second and third points, which we consider together, Bi–State claims the trial

court erred in admitting expert testimony valuing the Green Space based on the "across-the-fence" appraisal methodology.[6] The subdivision's expert used the same methodology to value University Drive, but Bi–State does not challenge the trial court's admission of that evidence.

 In condemnation proceedings, we review admission of expert testimony for an abuse of discretion, and we will not reverse the trial court's determination absent a substantial and glaring injustice. *St. Charles County v. Olendorff,* 234 S.W.3d 492, 495 (Mo.App. E.D.2007). A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and is so arbitrary and unreasonable that it shocks the sense of justice, indicating a lack of careful deliberation. *Gallagher v. DaimlerChrysler Corp.,* 238 S.W.3d 157, 166–67 (Mo.App. E.D.2007). An expert's opinion of value need not be based on specific market data, such as comparable sales, where there is other factual basis for the expert's opinion. *Olendorff,* 234 S.W.3d at 497 (citing *State ex rel. State Highway Comm'n v. Koberna,* 396 S.W.2d 654, 663 (Mo.1965)).

Bi–State's overarching complaint is the trial court's admission of the subdivision's appraisal methodology. The across-the-fence methodology is a variation of the comparable-sales approach and is used to value corridors, which are special-use properties assembled from portions of adjacent properties. Arthur G. Rahn, *Across the Fence Methodology for Valuation of Corridors: What Is It and How Is It Used?,* THE APPRAISAL JOURNAL, July 2001, at 270, 270. Corridors have a variety of functions and serve as public and private transportation rights-of-way, carry utili-

ties, and support recreational uses. *Id.* As long, narrow strips of special-use land, corridors are not usually bought and sold in the traditional real-estate market, and there are generally no similar properties in the area that an appraiser can use to determine a corridor's value via traditional application of the comparable-sales approach. *Id.* at 272. Because the methodology is based on the premise that corridor property should be worth at least as much as the land through which it passes, the value of corridor property is calculated based on the value of the adjacent property. *Id.* at 270.

 Bi–State challenges valuation of the Green Space as special-use property because it was located at the outer boundary of the subdivision and thus was saleable. The ultimate objective in any condemnation case is to provide the owner with just compensation for the taking of his or her property for public use. *City of St. Louis v. Union Quarry & Const. Co.,* 394 S.W.2d 300, 305 (Mo.1965). "Just compensation" is usually the fair market value of the property at the time of the taking, in other words what a willing buyer who was not obliged to purchase would pay a willing seller under no compulsion to sell. *Id.* But some properties are unique and are not typically bought and sold in the marketplace. 4 Nichols on Eminent Domain § 12C.01[1], at 12C–2 (Julius L. Sackman ed., 3d ed.2006). Consequently, there is generally no active market for special-use properties from which value can be determined. *Twin Chimneys Homeowners Ass'n v. J.E. Jones Const. Co.,* 168 S.W.3d 488, 503 (Mo.App. E.D. 2005). Such special-use properties include schools, churches, college campuses, build-

---

6. Because this condemnation action was filed before December 31, 2006, we need not consider any possible impact of sections 523.001 and 523.039 RSMo. (Supp.2007), which re-spectively define "fair market value" and set parameters for determining just compensation for actions filed after that date.

ings under construction, cemeteries, and subdivision common ground, *id.;* quarries and landfills, *Union Quarry,* 394 S.W.2d at 305; and corridors for transportation, utilities, and recreation, Rahn at 270.

The fair market value of property implies proof of sales of similar property in the community as a means of fixing the value of the property taken. When the property is such that evidence of fair market value is not obtainable, necessarily some other formula for fixing the fair value of the property must be devised. *State ex rel. State Highway Comm'n v. Mount Moriah Cemetery Ass'n,* 434 S.W.2d 470, 472 (Mo.1968) (quoting *Graceland Park Cemetery Co. v. City of Omaha,* 173 Neb. 608, 114 N.W.2d 29, 31 (1962)).

■ In this case, the subdivision's expert testified that the Green Space's size, shape, and use as common ground and utility corridor made it a special-use property of a kind not typically found in the marketplace. The subdivision's expert found no other sales of similar properties with which to compare the Green Space. While Bi–State's expert described six purportedly comparable properties, the properties he cited were, in fact, so dissimilar to and so far from the Green Space that they support the subdivision's contention that an alternative method of valuation was required. Further, the evidence supported the characterization of the Green Space as a special-use property, dictating another measure of valuation. The across-the-fence methodology, a variation of the comparable-sales methodology, provided that measure.

■ Bi–State next asserts that the subdivision's expert should have used University Drive to value the Green Space, rather than subdivision lots, because University Drive was the immediately adjacent property. Bi–State contends that relying on sales of nearby residential lots

was improper because they could accommodate construction of a single-family home, whereas the thirty-foot-wide Green Space could not. This fact does not render erroneous the application of the across-the-fence methodology. The across-the-fence methodology is based on the premise that corridor property should be worth at least as much as the land through which it passes, Rahn at 270, which in this case is property located in the subdivision. The inability to build single-family homes on the Green Space is immaterial. Bi–State's related complaints about lack of comparison to like properties and failure to make adjustments in the sales used are likewise misplaced. Because the subdivision's expert found no similar properties for sale in the St. Louis area, he did not conduct a comparable-sales analysis in the traditional manner, but instead applied the across-the-fence methodology.

Bi–State's contention that the subdivision's expert should have used the value of University Drive to value the Green Space is unpersuasive for an additional reason. Even if the subdivision's expert had appraised the Green Space on that basis, the subdivision's valuation would have remained the same. Bi–State has challenged neither the methodology used to value University Drive nor the value calculated. The subdivision's expert had also characterized University Drive as a special-use corridor for transportation and utility purposes, and he thus applied the across-the-fence methodology to it, concluding with the same value per square foot for University Drive as for the Green Space.

■ Bi–State further complains that the trial court erred in allowing across-the-fence valuation evidence because it resulted in valuation of the Green Space as a transportation right-of-way, which reflects its value to Bi–State rather than its value

to the subdivision. We reject this complaint. First, across-the-fence methodology is not only proper for transportation rights-of-way, but also other types of corridors, including those used to carry utilities and for recreational purposes. *Id.* at 270, 273–74. Second, the subdivision's expert did not value the Green Space as a transportation corridor. Bi–State points to nothing in the record to support its contention, and our review of the record reveals none. The subdivision's expert stated multiple times that the Green Space was common ground and carried utilities, and he characterized the Green Space as a corridor, but never as a transportation corridor or transportation right-of-way before the taking.

▮▮▮ We find no abuse of discretion in the trial court's rejection of Bi–State's complaints. Each party presented its theory of how the Green Space should be valued, and the jury heard each theory and the experts' conclusions. Each expert's opinion was subject to cross-examination, and Bi–State's expert was allowed to counter the subdivision's methodology and explain why he believed it inapplicable. Bi–State's expert testified that $227,000 was just compensation for the Green Space while the subdivision's expert concluded that damages amounted to $1,769,573. After hearing the testimony of both experts, the jury assessed the subdivision's damages at $725,000 for Bi–State's taking of the Green Space, an award significantly closer to Bi–State's figure than the subdivision's. It is not error as a matter of law for a court to admit valuation evidence based on multiple methodologies. *See Olendorff,* 234 S.W.3d at 494, 498 (concluding that landowner's expert properly used both the comparable-sales and the cost-less-depreciation approaches). We see no substantial or glaring injustice in the admission of evidence concerning each party's valuation theory. We deny points two and three.

▮▮▮ In its fourth point, Bi–State claims the trial court erred in excluding evidence of special benefits to the subdivision by virtue of improvements Bi–State made to University Drive. It is well established that special benefits to the remaining portion of a landowner's property may be set off against the compensation award in a condemnation case. *State ex rel. State Highway Comm'n of Missouri v. Tate,* 592 S.W.2d 777, 778 (Mo. banc 1980). Special benefits are those that "accrue directly and proximately to the particular land remaining by reason of the construction of the public work on the part taken. Such benefits must, of course, be reflected in an increase in the market value of the land." *Id.* at 779 (Mo. banc 1980)(quoting *State ex rel. State Highway Comm'n v. Jones,* 321 Mo. 1154, 15 S.W.2d 338, 340 (banc 1929)). The condemnor bears the burden of proving special benefits. *Id.* at 782.

In an offer of proof, Bi–State's expert testified that the reduced maintenance costs the subdivision would enjoy due to a new street constituted special benefits. Bi–State's expert, however, did not know "specifically" that the subdivision had maintenance costs for University Drive or the amount. Using what he termed "really virtually an arbitrary analysis," Bi–State's expert determined that 23 percent of the total University Drive reconstruction costs constituted special benefits to the subdivision. The trial court properly excluded this evidence because it lacked foundation. There was no evidence of any connection to reduced maintenance costs, nor did Bi–State's figure bear any connection to any arguable increase in market value of the residue of the subdivision's property. *See id.* We deny Bi–State's fourth point.

In sum, Bi–State is not aggrieved by and has no standing to appeal the finding that the subdivision owned the Green Space. Moreover, even if Bi–State had standing, its current appeal of this issue is untimely. On Bi–State's second and third points, we conclude that the trial court did not abuse its discretion in allowing the jury to hear each expert's theory of valuation of the Green Space, including valuation pursuant to the subdivision's across-the-fence methodology. Finally, Bi–State's expert's proposed testimony, attributing some of University Drive's reconstruction costs as special benefits to the subdivision, lacked foundation, and the trial court properly excluded the evidence. We affirm the trial court's judgment.

BOOKER T. SHAW, J., concurs.

KENNETH M. ROMINES, J., Concurring in part and dissenting in part in separate opinion.

KENNETH M. ROMINES, Judge, concurring in part and dissenting in part.

I concur in the Court's opinion as to standing, and the valuation testimony. I dissent as to the special benefits analysis. I would allow the special benefits testimony as I find an adequate foundation for the expert testimony proffered.