**ST. LOUIS COUNTY, Missouri,**
**Appellant,**

v.

**RIVER BEND ESTATES HOME-**
**OWNERS' ASSOCIATION, et**
**al., Respondents.**

**No. SC 92470.**

Supreme Court of Missouri,
En Banc.

Sept. 10, 2013.

Patricia Redington, Carl W. Becker, Stephanie L. Hill, County Counselor, Clayton, for St. Louis County.

Robert Denlow, Paul G. Henry, Denlow & Henry, Clayton, for Property Owners.

PATRICIA BRECKENRIDGE, Judge.

St. Louis County appeals a judgment that awarded the property owners damages for the county's taking of their real property by eminent domain. St. Louis County claims that the judgment should be reversed and the case remanded because the record of the jury trial on the property owners' exceptions to the condemnation commissioners' report is inadequate for appellate review as portions of the trial proceedings were inaudible or not recorded. It also claims that the trial court abused its discretion in its evidentiary rulings by admitting irrelevant and prejudicial testimony while excluding rebuttal tes-

timony and evidence of an owner's opinion as to the value of the property. In addition, the county claims that the jury verdict was excessive and unsupported by the evidence. Lastly, the county challenges the trial court's award of heritage value because it claims that the statutes authorizing and implementing an award of heritage value violate article I, section 26; article III, section 38(a); and, article VI, sections 23 and 25 of the Missouri Constitution.

The record is sufficient for this Court to rule on the claims on appeal with confidence. Regarding the county's claims, this Court finds that any errors in the trial court's evidentiary rulings are either not preserved or not prejudicial. This Court also finds that the jury verdict was not excessive so as to require a new trial. Finally, this Court finds that the heritage value statutes are constitutionally valid. Therefore, the judgment of the trial court is affirmed.

## Facts and Procedure

St. Louis County determined that it was necessary to condemn 15 acres of real property located at 1653 Creve Coeur Mill Road in Chesterfield for the Page/Olive connector of the Highway 141 extension project. The 15–acre tract was deeded to Arthur Novel in 1904. While Arthur and his wife, Stella, lived on the property and operated it as a farm until their deaths, it had been vacant since 1968, and there is currently no house on the property. On the date of the taking, the property was heavily wooded with a creek, steep bluff, and sloping terrain.

St. Louis County filed its petition in condemnation in the circuit court of St. Louis County on December 22, 2009, with Arthur and Stella's descendants and their spouses as defendants.[1] On February 11, 2010, the trial court entered an order of condemnation, authorizing the acquisition of the property. Because the property owners and the city were unable to agree on the proper compensation, the trial court appointed three commissioners who held a hearing and filed a report. The condemnation commissioners awarded the Novels $320,000 as damages for the acquisition of the property. The Novels filed exceptions to the commissioners' award and requested a jury trial.

Prior to the jury trial, the commissioners filed an amended report with the finding that the Novels had owned the property for more than 50 years. The Novels then filed a motion for assessment of "heritage value," pursuant to sections 523.061 and 523.039.[2] The trial court sustained the motion and awarded heritage value in the amount of $160,000, resulting in a total award of $480,000.

The Novels' exceptions to the commissioners' report were tried by a jury from December 12 to December 15, 2011. After hearing the evidence, the jury assessed damages for the Novels in the amount of $1.3 million. The Novels then filed a motion for assessment of heritage value and entry of judgment. The trial court sustained the Novels' motion over the county's objections that the statutes defining "heritage value" and governing its assessment were constitutionally invalid. The court added $650,000 for heritage value to the jury's verdict and assessed interest

---

1. Arthur and Stella Novel's descendants and their spouses are defendants in this action because of their interest in the 15–acre tract. They are collectively referred to as "the Novels."

2. Unless otherwise indicated, all statutory references are to RSMo Supp.2012.

under section 523.045. The county filed a motion for a new trial, which the trial court denied.

The county appeals. Because three of its claims challenge the constitutional validity of sections 523.039 and 523.061, the statutes authorizing an award of heritage value when the property has been owned by one family for 50 or more years, this Court has exclusive jurisdiction. Mo. Const. art. V, sec. 3.

## I. Incomplete Transcript Does not Require a New Trial

In its first point, St. Louis County claims the trial court erred in failing to provide a complete record of the trial proceeding because the transcript of the electronic recording includes portions that are inaudible or omitted. Specifically, when the county received the transcript it had ordered, there were nine unrecorded bench conferences regarding objections and 146 instances of an inaudible word or words. St. Louis County argues that there cannot be meaningful review on appeal without a full and complete transcript of the trial proceedings.

■ Without a transcript, appellate courts "lack the necessary information to rule with any degree of confidence in the fairness, reasonableness and accuracy of our final conclusion." *Dale v. Dir., Mo. Dept. of Soc. Servs., Family Support & Children's Div.*, 285 S.W.3d 770, 772 (Mo. App.2009). Consequently, an incomplete record on appeal warrants reversal if the appellant can demonstrate that (1) due diligence was employed in an attempt to correct the shortcomings and (2) the incomplete nature of the record prejudiced him. *Skillicorn v. State*, 22 S.W.3d 678, 688 (Mo. banc 2000); *State v. Borden*, 605 S.W.2d 88, 91–92 (Mo. banc 1980).[3]

■ The county claims that it was prejudiced on appeal by the failure to record nine bench conferences because the recording device was not running when objections were raised and argued at the bench. The trial court's relocation of the bench microphone during bench conferences created the impression that the discussions at the bench were being recorded, and the court and the attorneys operated as if making a record of objections and arguments. To ameliorate the impact of the lack of a record of the bench conferences, the parties have filed a stipulation reconstructing the substance of the bench conferences. The parties' stipulation eliminates any prejudice the missing record could have caused.

■ The county also asserts that it was prejudiced by the inaudible parts in the transcript. In its reply brief, the county identified the inaudible parts of the transcript that it claims are material to particular claims of error and hinders its ability to address the issues on appeal. However, it fails to demonstrate that it exercised due diligence in an attempt to correct the inaudible parts. The county also fails to show

---

**3.** While the requirement of due diligence to correct any shortcomings in the record previously has been applied by this Court in criminal cases, it is equally applicable to civil cases because the due diligence requirement stems from Rule 81.12(a), which requires an appellant to cause a transcript of proceedings to be prepared and filed with the clerk of the appropriate appellate court. *State v. Borden*, 605 S.W.2d at 91–92 (noting that Rule 81.12(a) was made applicable to criminal cases by Rule 28.18, 1979 Rules, now Rule 30.04(c) and (d)). This Court, in *Borden*, held that an appellant does not discharge the appellant's duty by filing an incomplete transcript with the clerk but must "attempt to obtain by stipulation or motion the substance of the missing testimony or argument," and, if unable to supply the omission or correct the record, show that the omissions were prejudicial. 605 S.W.2d at 91–92.

how the inaudible word or words are, in fact, material. For example, the county asserts that inaudible words in the Novels' closing argument precluded the county from effectively demonstrating the extent to which the Novels utilized improper inflammatory and prejudicial language. In making that argument, it references six parts of the transcript. No objection was made to five statements by the Novels' attorney that contain an inaudible word or words, which the county now claims were improper closing argument. In the only identified instance in which a timely objection was made, the county claimed the Novels' attorney improperly characterized the issues in closing arguments. In that section of the transcript, there are no inaudible words.

During oral arguments, the county clarified that there is not any specific item missing from the transcript that has caused it prejudice but, rather, that the "cumulative effect" of the inaudible portions of the transcript causes it prejudice and precludes meaningful review. However, there is no cumulative effect that is sufficient to demonstrate prejudice. While many words in the transcript are inaudible, the substance of the witnesses' testimony and the statements made by the attorneys and trial court is apparent from the context of the inaudible word or words. Contrary to the county's claim, the inaudible words or phrases are not of key testimony or argument and are not material to the issues raised by the county's claims of error.

The county has failed to demonstrate how the omitted portions of the transcript—the unrecorded bench conferences and the inaudible words—prejudice it, either in a single instance or cumulatively. Without a showing of prejudice, the omitted portions of the transcript do not impede this Court from ruling with confi-

dence on the fairness, reasonableness, and accuracy of the trial court's final decision concerning the points of the county's appeal. The incompleteness of the record does not warrant reversal of the judgment and remand for a new trial. *Skillicorn*, 22 S.W.3d at 688.

## II. Evidentiary Rulings Not an Abuse of Discretion

 In four of its points relied on, St. Louis County claims error in the trial court's evidentiary rulings. Generally, a trial court has considerable discretion in admitting or excluding evidence. *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. banc 2011). This Court gives deference to the trial court's evidentiary rulings and will reverse the trial court's decision about the admission or exclusion of evidence only if the trial court clearly abused its discretion. *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 367 (Mo. banc 1993). When reviewing for an "abuse of discretion," this Court presumes the trial court's ruling is correct and reverses only when the ruling "is clearly against the logic of the circumstance, is arbitrary and unreasonable, and indicates a lack of careful consideration." *State ex rel. McKeage v. Cordonnier*, 357 S.W.3d 597, 599 (Mo. banc 2012) (quoting *Green v. Fred Weber, Inc.*, 254 S.W.3d 874, 880 (Mo. banc 2008)). "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion." *In re Care and Treatment of Donaldson*, 214 S.W.3d 331, 334 (Mo. banc 2007).

### A. Evidence of Unwillingness to Sell and Heritage Value

The first evidentiary error claimed by the county is that the trial court improperly allowed the Novels' testimony of their personal attachment to the property and the forced nature of the property's acquisi-

tion by the county, claiming this evidence inflamed and prejudiced the jury against it. The county asserts that the Novels were entitled only to compensation for the fair market value of their property, noting that the legal definition of "fair market value" is "what a reasonable buyer would give who was willing but did not have to purchase, and what a seller would take who was willing but did not have to sell." *City of St. Louis v. Union Quarry & Constr. Co.*, 394 S.W.2d 300, 305 (Mo.1965). A sentimental attachment or an unwillingness to sell is not a consideration in determining fair market value. *See* section 523.001.1 ("[T]he value of the property taken after considering comparable sales in the area, capitalization of income, and replacement cost less depreciation, singularly or in combination, as appropriate, and additionally considering the value of the property based upon its highest and best use, using generally accepted appraisal practices."). The county states that prejudice from the error in admitting evidence of the Novels' sentimental attachment to and unwillingness to sell the property was exacerbated by the trial court's exclusion of evidence informing the jury that heritage value would be added to the amount of the jury's verdict.[4]

The county identifies seven places in the transcript where it claims that Derek Novel or other witnesses inappropriately testified of the Novels' attachment to the property or their unwillingness to sell. It also references six statements in closing arguments when counsel for the Novels stated that the property was taken by eminent domain and that the Novels did not willingly sell the property but were forced to sell at a time when prices had not recovered from the recession. The county claims these statements exacerbated the prejudice from the improper admission of evidence.

■■■ The county failed to preserve any of its claims of error regarding the admission of evidence of the Novels' attachment to the property and their unwillingness to sell. In the 13 references the county makes to the transcript in this point, it only objected once, pertaining to the Novels' criticism of a comparable sale used by the county's expert to arrive at his value for the property. The county did not object to any of the testimony it claims the trial court erroneously admitted regarding the Novels' attachment to the property or unwillingness to sell.[5] In fact,

4. The Novels ask this Court to deny any claim of error in this point relied on because they claim it is unclear whether the county is claiming error for the admission of evidence as to the Novels' attachment to the property and unwillingness to sell or for the exclusion of evidence of the heritage value statutes or for both. The county clarified in its reply brief that it was claiming error only in the admission of evidence of the Novel's attachment to and unwillingness to sell their property. It clarifies that the discussion of the exclusion of evidence of the addition of heritage value "highlights the prejudice" to the county.

5. The county claims it objected to the testimony of Ernest Demba, the Novels' appraiser, because Mr. Demba referenced the Novels'

history with the property while emphasizing its sentimentality. The county claims that the trial court overruled its objection at an unrecorded bench conference and, thereafter, Mr. Demba was permitted to testify about the history of the family's property in such a manner as to invoke sympathy for the Novels and bias against the county. The transcript of Mr. Demba's testimony contradicts the county's characterization of Mr. Demba's testimony after the objection. After the unrecorded side bar, Mr. Demba testified regarding how the Novel family accessed their home in the back of the property. He then was asked how long the property had been in the family and responded since 1904, which was more than 100 years. Mr. Demba merely was testifying about facts regarding the length of time the family owned the property, and his testimony

the county elicited some of the testimony it claims was erroneously admitted.[6]

■ A party may not complain on appeal that the trial court erred in admitting evidence if the complaining party was the first to admit evidence of that type. *See Union Elec. Co. v. Metro. St. Louis Sewer Dist.*, 258 S.W.3d 48, 57 (Mo. banc 2008); *see also State v. Mickle*, 164 S.W.3d 33, 57 (Mo.App.2005); *Bowls v. Scarborough*, 950 S.W.2d 691, 702 (Mo.App.1997); *Anderson v. Rojanasathit*, 714 S.W.2d 894, 896 (Mo.App.1986). "To properly preserve a challenge to the admission of evidence, the objecting party must make a specific objection to the evidence at the time of its attempted admission." *Mickle*, 164 S.W.3d at 55; *see also State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992); *Bowls*, 950 S.W.2d at 702 ("In order to preserve any error in this regard, Appellants were required to await an attempt by Respondents to introduce evidence of the conversation and to object at that time."); *Anderson*, 714 S.W.2d at 896 ("Nor can a plaintiff claim error for the admission of his own evidence. Plaintiffs' remedy was to resist and preserve error on matters considered in the ruling on the motion in limine, if any.").

Additionally, the county did not object to or raise a separate claim of error for any of the references in closing arguments to the Novels' forced sale of the property at an economically bad time. The county's failure to preserve its claims of error precludes review of any claim that the trial court erred in admitting evidence of the Novels' attachment to the property and unwillingness to sell. *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 97 n. 14 (Mo. banc 2010) (finding that failure to object to evidence as it is admitted at trial does not preserve that issue for appellate review).

■ Within this point, the county also asserts that the trial court compounded its error by refusing to let the jury know that the Novels would, in fact, be receiving additional compensation of 50 percent of any jury award to compensate them for the "heritage value" of the property. Because this Court has found there was no error in the admission of the evidence, there was no exacerbation of error. Additionally, when the jury has found that the property was owned by the same family for 50 or more years, the judge computes heritage value as 50 percent of the amount the jury found to be the fair market value of the condemned property. Sections 523.001(2) and 523.061; *State ex rel. White Family P'ship v. Roldan*, 271 S.W.3d 569, 574 (Mo. banc 2008). The definition of "fair market value" permits the jury to consider only the "value of the property ... based upon its highest and best use...." Sections 523.001(1) & 523.039(1). Consequently, the heritage value statute was irrelevant to the jury's given task of determining the fair market value of the

---

of the history was not given in such a manner to generate sympathy for the Novels and bias against the county.

6. The county attempts to excuse its failure to object by stating that some of the objectionable statements actually were contained in questions posed by the Novels' counsel, so an objection would have done little to correct or mitigate the damage that was done. This argument does not aid the county because failing to object to improper questions also fails to preserve anything for appeal. *See Perkins v. Kroger Co.*, 592 S.W.2d 292, 294–95 (Mo.App.1979) (stating that it is the duty of the party to object to the form of a question and point out how it is erroneous if that party desires to preserve that question for appeal). The county then seeks plain error review. Plain error review rarely is granted in civil cases, and there is no circumstance warranting plain error review in this case. *Goltz v. Masten*, 333 S.W.3d 522, 524 (Mo.App.2011).

property. The trial court, therefore, did not abuse its discretion by excluding evidence of the statute.

### B. Mr. Novel's Previous Statement at Commissioners' Hearing

██ The county contends that the trial court erred in excluding evidence that, during the commissioners' hearing, Mr. Novel stated his opinion that the value of the Novels' 15 acres was $496,000. It claims this statement was admissible as an admission against a party's interest and to impeach Mr. Novel's testimony at trial that he never had an opinion about the value of the property.

The trial court excluded evidence of the statement Mr. Novel made at the commissioners' hearing, finding that Mr. Novel was not stating his opinion of the value of the property but, instead, was stating the amount he would have taken to settle the case in his settlement negotiations with the county. Because the trial court found that Mr. Novel had not made a statement of his opinion about the value of the property, the statement was neither a statement against his interest nor a statement inconsistent with his trial testimony that he never had an opinion of the property's value.

The county points to testimony by Mr. Novel when he was cross-examined at trial regarding whether he had an opinion as to the value of the 15 acres. Specifically, the questions asked and the answers Mr. Novel gave were as follows:

Q: All right. We started to talk about this yesterday. Do you have today an opinion of the value what the property is worth?

A: No, I do not. I'm not an appraiser or an engineer, so I would have, from a laymen's point of view would not have a way to determine the value of the property.

Q: Did you at any other time have an opinion of value as to the property?

A: No, I did not.

██ After Mr. Novel made these statements, the county sought to cross-examine him regarding whether he previously had testified at the commissioners' hearing that his opinion as to the value of the 15 acres was that it was worth $496,000–$800,746 less than the testimony of the Novels' appraiser at trial. Upon the Novels' objection to the question, the trial court heard counsel's argument outside the presence of the jury. In addition to the argument of counsel, the trial court considered evidence regarding whether Mr. Novel's statement at the commissioners' hearing was a statement of value and, if so, whether it was admissible as a party's statement against interest or a prior inconsistent statement of a witness.[7] In particular, the trial court reviewed the deposition testimony of James Herries, an employee of St. Louis County who acted as its negotiator with the Novels. Mr. Her-

---

7. Evidence of a commissioners' award may be objectionable, ostensibly under grounds that it would be both irrelevant and prejudicial. See State ex rel. Mo. Highway & Transp. Comm'n v. Sisk, 954 S.W.2d 503, 510 (Mo. App.1997); State ex rel. County of St. Charles v. Latham, 868 S.W.2d 177, 181–82 (Mo.App. 1994). Nevertheless, inconsistent statements made during a condemnation commissioner's hearing are permissible under the general admissibility of prior inconsistent statements. E.g., Sisk, 954 S.W.2d at 510. In addition, it appears that an admission against interest would be admissible under the same reasoning. "Admissions against interest are those made by a party to the litigation or by one in privity with or identified in legal interest with such party, and admissible whether or not the declarant is available as a witness." Carpenter v. Davis, 435 S.W.2d 382, 384 (Mo. banc 1968).

ries' testimony was that he, and possibly other county negotiators, came to a tentative agreement with Mr. Novel during settlement negotiations that the Novels would be paid $496,000 as their damages for the taking of the 15 acres.[8] When the county would not agree to pay the negotiated figure, no settlement was reached, and there was a hearing before the three commissioners appointed by the trial court.

There was no official record of the commissioners' hearing. Consequently, Mr. Herries was asked about Mr. Novel's testimony before the commissioners in his deposition. After the trial court reviewed Mr. Herries' deposition testimony and heard argument of counsel, the court sustained the Novels' objection to questions to Mr. Novel about his statements in the commissioners' hearing.

Later during trial, the county made an offer of proof. Its offer of proof was not Mr. Novel's response to its questions but rather was testimony from Mr. Herries. Mr. Herries was asked by counsel for the county whether he ever heard an expression of the value of the property other than in settlement negotiations or an offer or demand. He responded affirmatively and then testified that Mr. Novel stated the value was $496,000 to non-county employees outside the context of any settlement or offer. The trial court asked what words Mr. Novel used, and Mr. Herries responded, "That I'll settle for 496,000," and confirmed that this statement was made during Mr. Novel's testimony at the commissioners' hearing. The court then asked what question elicited this response from Mr. Novel. Mr. Herries answered, "What I can remember is that the commissioners requested a settlement or what he thought the value was worth or what the

property was worth." When the court completed its questioning of Mr. Herries, counsel for the county asked Mr. Herries whether the commissioners specifically asked what Mr. Novel's opinion of value was. Mr. Herries answered that they did, and stated that Mr. Novel responded to their question with $496,000.

When the trial reconvened the next morning, the county filed with the trial court its written Plaintiff's Response to Motion in Limine, setting out cases to support its argument that statements made in a commissioners' hearing may be admitted at trial for impeachment purposes so long as there is no reference to the commissioners' hearing or the commissioners' award. The court then stated on the record that it found there was not an inconsistent statement because it did not believe that Mr. Novel stated his opinion of the value of the property while he was testifying before the commission. Rather, according to the court, it "believe[d] that the number that was given at the commissioner's hearing at $496,000 was not representative as a number of what [Mr. Novel] believes the fair market value of the property was, but what he was willing to settle for after extended negotiations between the two sides with regards to numbers."

In light of this finding by the trial court, the county's claim that the trial court erred in not admitting Mr. Novel's prior inconsistent statement fails. The trial court is free to believe all, part, or none of the testimony of Mr. Herries. *Sch. Dist. of Kansas City v. State*, 317 S.W.3d 599, 612 (Mo. banc 2010). The record, in the light most favorable to the trial court's ruling, supports a finding that Mr. Novel was asked his opinion regarding his posi-

---

8. Mr. Novel acted on behalf of the rest of his relatives during settlement negotiations with the county.

tion on settlement and that he responded with the amount for which he would he would have settled during his negotiations with the county. Because the trial court did not believe that Mr. Novel stated his opinion about the value of the property while testifying at the commissioners' hearing, there was no prior inconsistent statement with which to impeach him.

■ Nor did the trial court err in not admitting the evidence of Mr. Novel's statement as an admission against interest. While an out-of-court statement that is an admission against interest might be an exception to the hearsay rule, offers of settlement are inadmissible. Negotiations for the peaceful settlement of disputes are encouraged under the law. *Hancock v. Shook*, 100 S.W.3d 786, 799 (Mo. banc 2003); *State ex rel. State Highway Comm'n v. Sheets*, 483 S.W.2d 783, 785 (Mo.App.1972). "If offers of settlement were admitted in evidence, they would have the natural tendency with the jury to denigrate the defense position at trial. No one would make such offers if the risk of their being before the jury were a necessary corollary of the offer." *J.A. Tobin Const. Co. v. State Highway Comm'n of Missouri*, 697 S.W.2d 183, 186 (Mo.App. 1985). The policy rationale behind the rule excluding evidence of settlement negotiations requires that "statements made with a clear purpose to resolve the existing dispute . . . be protected, even though uttered outside the negotiating arena." 2 C. Mueller & L. Kirkpatrick, *Federal Evidence* § 4:58 (3d ed.2007). The trial court was free to conclude that Mr. Novel's response to the commissioners' question was a statement of his position during settlement negotiations and not a statement of his opinion about the value of the 15 acres. Therefore, the trial court did not abuse its discretion by excluding evidence of Mr. Novel's statement.

## C. Mr. Demba's Testimony Regarding County's Comparable Sale and Rebuttal Testimony

In its next claim of error, the county asserts the trial court erred in admitting speculative testimony by Ernest Demba, the Novels' appraiser and expert witness who testified regarding his opinion about the value of the 15 acres. The county claims that the trial court erroneously admitted Mr. Demba's speculative testimony regarding the Terra Vista subdivision, a comparable sale used by one of the county's appraisers. It further claims the prejudice resulting from Mr. Demba's testimony was exacerbated when the court again erred in excluding rebuttal testimony from its appraiser, Jeff Gonterman, under the "project influence" doctrine. The county argues that Mr. Gonterman's testimony was admissible to rebut Mr. Demba's testimony disparaging one of the comparable sales used by Mr. Gonterman.

When testifying as an expert witness who appraised the 15 acres for the Novels, Mr. Demba stated that he utilized the comparable sales approach to determine a value for the property. He testified that the highest and best use of the property was for residential villa development because there are villa developments on adjacent properties, Mill Ridge and Terra Vista. Mr. Demba testified extensively about the Mill Ridge and Terra Vista properties and the history of their development as villas. Regarding the history of the development of Terra Vista villas, he testified that Mr. Walsh, the owner who sold the property to the developer, retained some property for his personal residence and negotiated for improvements to the property he retained as partial compensation for the sale. He also testified that he talked with Mr. Walsh and that Mr. Walsh sold the property to the devel-

oper unaware that there were changes in the designation of part of the property from floodway, which cannot be developed, to floodplain, which may be developed if the property meets certain specifications.

During further questioning by the Novels' counsel, Mr. Demba testified that he did not use the sale of the Walsh property that was developed as the Terra Vista villas as one of his three comparable sales. The Terra Vista property was sold by Mr. Walsh for a much lower price, 30 cents per square foot, than Mr. Demba's valuation of the 15 acres, $2 per square foot. Mr. Demba stated that he did not consider the Terra Vista property a comparable sale because "the sale at 30 cents . . . was not a true money consideration" as Mr. Walsh received consideration other than money and, when Mr. Walsh sold the property, he was under the impression that it could not be developed. He stated that Mr. Walsh was not a knowledgeable seller, which is a requirement for fair market value.

During its cross-examination of Mr. Demba, the county questioned him at length regarding his statement that "certain information leaked out to the developer for Terra Vista." According to Mr. Demba, this information advised the developer, who was involved in the real estate market in the area, about the study that eventually resulted in changing the designation of the property from floodway to floodplain. The county also questioned him about the federal government's process of changing the designations of property and whether those changes had been finalized during the relevant time for the Walsh sale.

 The county did not object to any of Mr. Demba's testimony that it now challenges. In fact, as noted, the county elicited some of the testimony it challenges. Consequently, the county has not preserved for review any error in the admissi-

bility of that testimony from Mr. Demba. *McHaffie v. Bunch,* 891 S.W.2d 822, 830 (Mo. banc 1995) ("A party who fails to object to testimony at trial fails to preserve the issue for appellate review."); *Alvey v. Sears, Roebuck & Co.,* 360 S.W.2d 231, 234 (Mo.1962), (finding that a party cannot object to the admission of evidence that is the same as evidence it has introduced).

Regarding the county's claim that the trial court improperly excluded testimony from Mr. Gonterman, the county's appraiser, which was intended to rebut Mr. Demba's testimony, the claim of error lacks merit. During the county's direct examination of Mr. Gonterman, he was questioned about Mr. Walsh's sale of the property on which the Terra Vista villas were developed. He testified that he had talked with Mr. Walsh and expressed his opinion that "Mr. Walsh seemed to be a very savvy or educated property owner." When asked why he had this opinion, Mr. Gonterman discussed the conditions under which Mr. Walsh sold the property to the developer of the Terra Vista villas. The county then asked Mr. Gonterman whether Mr. Walsh still lived on the property he retained when he sold property to the developer of the Terra Vista villas. Mr. Gonterman testified that Mr. Walsh had sold the property to another developer "who acquired the property hoping to get, [he guessed], bidding or be involved in the construction or be part of the construction for the Page/Olive connector. . . ."

When the county inquired about the price that Mr. Walsh had received when he sold the property he retained for his residence, the Novels objected that the purchase price was irrelevant. Counsel for the parties then were invited to approach the bench. The exchange between the parties and the judge was held off the record and, although the judge's ruling

was not in the trial transcripts, both parties agree that the judge sustained the Novels' motion excluding testimony regarding that price.

■ The county claims that the ground on which the trial court excluded Mr. Gonterman's testimony was the "project influence" doctrine. This objection would be a different one than the relevance objection made before counsel were called to the bench. Nevertheless, this evidence was properly excluded on either ground. First, the evidence of the sale of Mr. Walsh's personal residence occurred years after his sale of the property to the developer of the Terra Vista villas, under different circumstances that involved different considerations—no conditions of sale other than the payment of money, a different real estate market, different participants, and the potential for condemnation. For the evidence of the sale price of Mr. Walsh's residence to be admissible, it must have been both logically and legally relevant. *Conley v. Kaney,* 250 S.W.2d 350, 353 (Mo.1952). While the price Mr. Walsh negotiated for the sale of his residence might have some logical relevance to show his sophistication at the time he sold the Terra Vista villas property, the fact that years had passed between the two sales and that the sales occurred under different conditions make the logical relevance of the evidence insignificant. Regarding legal relevance, the limited probative value of Mr. Walsh's property does not outweigh the possibility that the evidence of a non-comparable sale would be confusing to the jury.

■ Additionally, under the "project influence" doctrine, juries are prohibited from "consider[ing] either enhancements or depreciation brought about by the construction of [an] improvement for which the property is being taken. In other words, the value should be determined independent of [any] proposed improvement." *St. Louis Elec. Terminal Ry. Co. v. MacAdaras,* 257 Mo. 448, 166 S.W. 307, 310 (1914). Under this doctrine, Missouri courts may exclude evidence of sales that are influenced by the project for which a property is being acquired. *Quality Heights Redevelopment v. Urban Pioneers,* 799 S.W.2d 867, 870 (Mo.App.1990).

In this case, the record shows that the purchase price the county wished to admit into evidence was influenced by the same public project as the Novels' 15 acres. The county argues that "[t]here was no evidence suggesting that the purchase price and terms of the sale of the home had anything to do with the 'proposed improvements,' the highway, thus the project influence doctrine would simply not apply." This argument is refuted in the record by the testimony of the county's own witness. As noted previously, before Mr. Gonterman was asked the purchase price of Mr. Walsh's sale of his residence, Mr. Gonterman testified that the property also was "involved in the eminent domain [sic]" and that its buyers hoped to "be part of the construction" of the highway project. Under these circumstances, the trial court did not abuse its discretion by excluding this portion of Mr. Gonterman's testimony.

### D. Testimony of County's Expert Witnesses Concerning Potential Development

■ In its fourth evidentiary issue, the county claims the court erred in excluding testimony from two witnesses employed by the city of Chesterfield, the municipality in which the 15 acres is located, regarding obstacles to the development of the subject property. The county claims that this testimony was needed to rebut testimony given by Mr. Demba and Dan Wind, a civil engineer who was retained as an expert

witness by the Novels. The targeted testimony dealt with the number of villas that could be developed on the 15 acres and Mr. Demba's and Mr. Wind's efforts to discount the complexity of the development issues and the review process for approval of a villa development project.

In this claim of error, the county does not assert that the trial court erred in admitting the testimony of Mr. Wind and Mr. Demba. The only error asserted is that the trial court erred in not permitting two witnesses it called to testify concerning the effect that the development challenges would have on the value of the 15 acres. The witnesses were Jeff Paskiewicz, a civil engineer in the city public works department who managed capital improvement projects for Chesterfield, and Aimee Nassif, city planning and development director for Chesterfield.

The county first claims that the trial court erroneously granted the Novels' motion in limine and prohibited Mr. Paskiewicz from testifying with respect to the development of the 15 acres and the potential development problems associated therewith. In their motion in limine, the Novels stated that, prior to trial, the county had identified Mr. Paskiewicz and Ms. Nassif as "non-retained witnesses." The motion alleged that both witnesses were deposed, that Ms. Nassif indicated at her deposition that she would expect to testify as to the potential for rezoning the 15 acres, and that Mr. Paskiewicz stated that he may testify about the probability of whether the 15 acres would receive a "map revision" regarding flooding risk. The Novels then objected to testimony from the two witnesses "as to how the City would or would not act with regard to [the 15 acres]," citing *State ex rel. Missouri Highway & Transportation Commission v. Gannon,* for the principle that "a member of the government organization making rezoning decisions ... should not give an opinion on something which has yet to come before that decisional body." 898 S.W.2d 141, 142 (Mo.App.1995). When addressing this motion in limine, the trial court stated that it agreed that these Chesterfield employees could not testify about their opinion as to what actions Chesterfield would take regarding the development of the 15 acres because the employees do not have authority to speak for the city council.

Prior to Mr. Paskiewicz being called as a witness for the county, counsel for the county asked to approach the bench. The side bar with the trial court was not recorded, but the county has filed with this Court a stipulation in which the parties agree that the trial court granted the Novels' motion in limine to limit the testimony of the county's non-retained experts, Mr. Paskiewicz and Ms. Nassif. When the county began the direct examination of Mr. Paskiewicz, the Novels objected to any opinion testimony regarding development of the subject property because Mr. Paskiewicz was a non-retained expert witness. The county countered with the argument that its expert witnesses had the knowledge and expertise to testify as to Chesterfield's requirements for development and the possible challenges to such development and that their testimony was admissible. The court ruled that the testimony of such experts be limited to general application of Chesterfield's development requirements, prohibiting any specific application to development of the subject property.

After this ruling, Mr. Paskiewicz testified at great length. He testified about levee districts and maps depicting flood risk areas as well as how the maps are created, drafted and maintained. He also testified as to his review and approval of the Terra Vista and Mill Ridge developments, the general process of approving

improvements to a property to remove it from the limitations of a floodplain designation, challenges the Terra Vista and Mill Ridge developments faced, and the Chesterfield ordinances governing floodplain management and development in Chesterfield. While Mr. Paskiewicz testified about his familiarity with the location of the Novels' property on a map, no questions were asked of Mr. Paskiewicz or objections made regarding the specific development of the 15 acres, the potential development problems associated therewith, or what action Chesterfield would take regarding the development of the property.

Ms. Nassif testified that she was familiar with the Terra Vista and Mill Ridge subdivisions and the Novels' property. She testified about her involvement in the development of the Terra Vista property. She described the planning process generally and how the Terra Vista property proceeded through the planning process. She also testified regarding site specific ordinances and environmental restrictions and conditions. She used the Terra Vista property as an example when she described the process of applying for a planned environment unit, which allows a developer to have different uses and flexibility in the design in exchange for preservation and protection of natural areas and topography on the development site. She testified as to how the shape and terrain of a property impacts the density of its development. She also testified that it was a difficult process to remove areas out of a floodplain and that there were requirements for open space; landscape, creek, and stream buffers; tree preservation;

water quality; lighting; structure setbacks; parking; and sanitary and storm water sewers. No questions were asked of Ms. Nassif or objections made regarding the specific development of the 15 acres, the potential development problems associated therewith, or what action Chesterfield would take regarding the development of the property.

The county intended to present the testimony of these experts to show how development challenges would impact the value of the 15 acres. While the trial court sustained the Novels' objection so that Mr. Paskiewicz and Ms. Nassif were prevented from testifying about the 15 acres, the two witnesses testified extensively regarding general requirements, challenges, and risks associated with the development of property in a floodplain and floodway. This testimony related directly to the challenges caused by land conditions that previously were identified by Mr. Demba and Mr. Wind as present on the 15 acres, including a creek running through the property, sloping terrain, and being designated within a floodway, floodplain, or wetlands. Ms. Nassif testified, in particular, about the rigorous requirements for city approval to develop in a floodplain. This evidence was clear rebuttal to the testimony of the Novels' experts that it would not be difficult to get approval of the villa development plans or to construct a villa development on the 15 acres.[9]

Nevertheless, the issue presented by the county's claim is whether the trial court abused its discretion by preventing the county from specifically asking these non-retained experts about their opinions re-

9. The county argues the Novels deposed Mr. Paskiewicz and Ms. Nassif, so they were on notice of the evidence these non-retained experts would have given concerning how zoning and development issues would have affected the value of the 15 acres. In the depositions, however, neither non-retained expert provided an opinion as to how the development issues would affect the value of the 15 acres, even after being invited to do so.

garding the 15 acres. Discovery rules distinguish between facts and opinions held by non-retained experts from those held by experts who acquired facts and developed opinions in anticipation of litigation. *See* Rule 56.01(b)(4),(5). When asked in interrogatories, a party must disclose any expert witness it expects to provide testimony regarding facts known and opinions developed in anticipation of litigation. *Id.* at 56.01(b)(4)(a). Discovery rules also permit parties to compel their opponents "to state the general nature of the subject matter on which the expert is expected to testify." Rule 56.01(b)(4)(a). On the other hand, disclosure requirements for a non-retained witness are limited to their identity and their field of expertise. Rule 56.01(b)(5). Otherwise, any information that they provide is discoverable in the same manner as other lay witnesses. *Id.*

The discovery rules treat experts differently depending on the expected scope of their testimony. To give advance notice to the opposing party and avoid unfair surprise, Rule 56.01(b)(4) requires a party to disclose more information with respect to expert witnesses who acquired facts and have formed opinions in preparation for litigation. *See State ex rel. Mo. Highway & Transp. Comm'n v. McDonald's Corp.*, 872 S.W.2d 108, 113 (Mo. App.1994). "The purpose of the discovery rules is to take the surprise out of trials of cases so that all relevant facts and information pertaining to the action may be ascertained in advance of trial." *State ex rel. Bush v. Elliott*, 363 S.W.2d 631, 636 (Mo. banc 1963); *State ex rel. Plank v. Koehr*, 831 S.W.2d 926, 927 (Mo. banc 1992) ("[R]ules relating to discovery were designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits . . . .").

Early in the litigation, the county identified Mr. Paskiewicz and Ms. Nassif as non-retained expert witnesses, providing to the Novels only that information required by Rule 51.04(b)(5), namely, their names and titles with the city of Chesterfield. Additionally, the county did not ask them to prepare an opinion concerning the 15 acres for the purpose of this litigation. However, the expert testimony the trial court excluded would have been developed in anticipation of the litigation. During the Novels' depositions of each of those experts, it became apparent that they had no involvement with the Novels' property prior to their contact with the county. For example, Mr. Paskiewicz testified that he was "[b]riefly" familiar with the area containing the Novels' property on the map, but he had no specific knowledge about the Novels' property even though he had specific knowledge about two nearby subdivisions. Furthermore, neither experts' job had familiarized him or her specifically with the difficulties of developing the Novels' property. Accordingly, any opinion regarding the 15 acres would have been formed in anticipation of this litigation.

Notwithstanding the fact that the county treated Mr. Paskiewicz and Ms. Nassif as non-retained experts during discovery, it asked the trial court to allow them to testify about their opinions regarding the developmental challenges to the 15 acres, opinions that were formed in anticipation of litigation. Because the county did not provide an opinion from Mr. Paskiewicz and Ms. Nassif in discovery, the Novels were not properly put on notice of the intended subject of their testimony. As such, allowing Mr. Paskiewicz and Ms. Nassif to testify about their opinions formed in preparation for this litigation would frustrate the purpose of the rules of discovery. Therefore, the trial court did not abuse its discretion in excluding testimony that failed to comply with the requirements of Rule 56.01(b)(5).

### III. Jury's Verdict Not Grossly Excessive and Not Against the Weight of the Evidence

St. Louis County claims that the trial court erred in overruling its motion for a new trial and entering judgment because the jury's $1.3 million verdict was excessive in that it was against the weight of the evidence. When the county filed its principal brief raising this claim of error, it asserted that the verdict exceeded the evidence by $31,000. In its reply brief, however, it concedes that the amount by which the verdict exceeded the evidence was $3,254. Nevertheless, it continues to claim it was an excessive verdict that shows the jury was swayed by passion and prejudice.

The standard of review for a trial court's order denying a motion for a new trial is abuse of discretion. *Bowan v. Express Med. Transporters, Inc.*, 135 S.W.3d 452, 456 (Mo.App.2004). A trial court abuses its discretion when:

> [A] ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *McGuire v. Seltsam*, 138 S.W.3d 718, 720 (Mo. banc 2004). The denial of a new trial would be an abuse of discretion if it were based on findings not substantially supported by the record. *Bowan*, 135 S.W.3d at 456.

*In re H.L.L.*, 179 S.W.3d 894, 896–97 (Mo. banc 2005). In reviewing a trial court's order denying a motion for a new trial, the evidence is viewed in a light most favorable to the trial court's order. *Badahman v. Catering St. Louis*, 395 S.W.3d 29, 39–40 (Mo. banc 2013).

At trial, Mr. Demba testified that the subject property was valued at $2 per square foot. When asked whether his valuation of $2 per square foot multiplied by 648,373 square feet gives a value of $1,296,746, he stated, "That's true," He then was asked, "So that's close to 1.3 million?" and he responded, "Yes."

In addition to Mr. Demba's testimony, the $1.3 million amount was mentioned in the Novels' closing argument. Their counsel stated, "Every foot of land is worth $2 a square foot over the entire land. And that is technically like $1.29, but we round it to $1.3 million." When the jury reached its verdict, it awarded the Novels $1.3 million for the property. The county claims this verdict exceeded the evidence by $3,254 or 0.25 percent.

The evidence viewed in the light most favorable to the trial court's order denying the motion, is that the Novels were damaged in the amount of $1,296,746, which rounds up to $1.3 million. During the questioning of Mr. Demba and the closing argument of the Novels' counsel, the county did not object that it was improper for $1,296,746 to be rounded up to $1.3 million. From these facts, it is clear that the jury rounded up the amount of damages like Mr. Demba did in his testimony and the Novels' counsel did in closing argument. It is easy to understand why the jury more easily could remember $1.3 million than $1,296,746 when setting the damages.

The opinion of a single qualified witness constitutes substantial evidence to support a jury's verdict. *Heins Implement Co. v. Missouri Highway & Transp. Comm'n*, 859 S.W.2d 681, 692 (Mo. banc 1993), *abrogated on other grounds as recognized by Southers v. City of Farmington*, 263 S.W.3d 603 (Mo. banc 2008); *State ex rel. State Highway Comm'n v. Hamel*, 404 S.W.2d 736, 739 (Mo.1966). Mr. Demba's testimony describing the value of the 15 acres as $1.3 million provides substantial evidence to support the verdict. Therefore, the trial court did not abuse its discretion when it overruled the county's motion for a new trial.

## IV. Heritage Value Statutes Constitutionally Valid

St. Louis County also asserts that sections 523.039 and 523.061, the statutes authorizing and implementing an award of heritage value, violate the Missouri Constitution in three respects: (1) the General Assembly impermissibly altered the judicial definition of "just compensation" by permitting the addition of heritage value to fair market value, in violation of article I, section 26 of the Missouri Constitution; (2) the heritage value statutes require that the county expend public funds without a public purpose in violation of article III, section 38(a) and article VI, sections 23 and 25 of the Missouri Constitution; and, (3) the statutory requirement that a judge compute heritage value invades the province of the jury to determine just compensation for land taken by eminent domain, in contravention of article I, section 26 of the Missouri Constitution.

"The standard of review for constitutional challenges to a statute is de novo." *City of Arnold v. Tourkakis,* 249 S.W.3d 202, 204 (Mo. banc 2008). Statutes are presumed to be constitutional. *State v. Young,* 362 S.W.3d 386, 390 (Mo. banc 2012). "This Court will not invalidate a statute unless 'it clearly and undoubtedly violates some constitutional provision and palpably affronts fundamental law embodied in the constitution.' " *Id.* (quoting *State v. Richard,* 298 S.W.3d 529, 531 (Mo. banc 2009)). The county, as the party challenging the validity of the heritage value statutes, bears the burden of proving the statutes clearly and undoubtedly violate the constitution. *Id.*

### A. Legislature Did Not Impermissibly Alter Definition of "Just Compensation"

The Bill of Rights Preamble and article I, section 26 of the Missouri Constitution provide that, "In order to assert our rights, acknowledge our duties, and proclaim the principles on which our government is founded, we declare: ... [t]hat private property shall not be taken or damaged for public use without just compensation." The term "just compensation" is not defined in the constitution, but the United States Supreme Court and this Court long have interpreted it to mean "the 'fair market value' of the property at the time of the taking." *E.g., Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); *City of St. Louis v. Union Quarry,* 394 S.W.2d 300, 305 (Mo.1965). "The fair market value of land is what a reasonable buyer would give who was willing but did not have to purchase, and what a seller would take who was willing but did not have to sell." *Union Quarry,* 394 S.W.2d at 305.

In 2006, the Missouri General Assembly "enacted a statutory definition of just compensation" codifying the judicial determination that "just compensation" means "fair market value" and providing for additional compensation for the taking of homesteads and properties held within the same family for 50 or more years. *State ex rel. White Family P'ship,* 271 S.W.3d at 572. Section 523.039 states, in part:

In all condemnation proceedings filed after December 31, 2006, just compensation for condemned property shall be determined under one of the three following subdivisions, whichever yields the highest compensation, as applicable to the particular type of property and taking:

(1) An amount equivalent to the fair market value of such property;

(2) For condemnations that result in a homestead taking, an amount equivalent to the fair market value of such property

multiplied by one hundred twenty-five percent; or

(3) For condemnation of property that results in any taking that prevents the owner from utilizing property in substantially the same manner as it was currently being utilized on the day of the taking and involving property owned within the same family for fifty or more years, an amount equivalent to the sum of the fair market value and heritage value.

Section 523.001 defines "heritage value" as 50 percent of the fair market value of a property that has been owned within the same family for 50 or more years. Accordingly, for qualifying properties that have been held within the same family for 50 or more years, "just compensation" under section 523.039 is the fair market value plus an additional 50 percent for heritage value, equaling 150 percent of the fair market value.

 The county asserts that these statutes were *ultra vires* because article II of the Missouri Constitution prohibits the legislature from enacting a law contrary to the Court's interpretation of the constitution. Specifically, the county claims that the General Assembly legislatively changed the meaning of "just compensation" in article I, section 26 to something more than "fair market value." *Union Quarry,* 394 S.W.2d at 305. The county is correct that "[c]onstitutional interpretation is a function of the judicial, and not the legislative branch." *Poertner v. Hess,* 646 S.W.2d 753, 756 (Mo. banc 1983). *See also Dickerson v. United States,* 530 U.S. 428, 437, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)

(Congress may not supersede a constitutional rule legislatively); *City of Boerne v. Flores,* 521 U.S. 507, 519, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (The legislative power "to enforce" does not include altering the meaning of a constitutional provision because the power "to enforce" does not include "changing what the right is."). Contrary to the county's argument, however, this constitutional principle is not implicated in the General Assembly's enactment of sections 523.039 and 523.061. Sections 523.039 and 523.061 do not alter this Court's definition of "just compensation," which serves as a constitutional floor below which the legislature cannot descend;[10] the statutes instead promote the legislature's intended policy of providing additional benefits to certain property owners whose real property is taken for public use.

The United States Supreme Court's decisions in *Mitchell v. United States* and *Joslin Mfg. Co. v. Providence* support the proposition that a legislature may compensate losses and damages beyond those traditionally included in its interpretation of "just compensation." 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644 (1925); 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923). *In Mitchell,* the Supreme Court considered the validity of a property owner's request for consequential damages for losses to a business when land was taken by eminent domain in Maryland. 267 U.S. at 344, 45 S.Ct. 293. The Supreme Court stated:

It does not follow that, in the absence of an agreement, the plaintiffs can compel payment for such losses. To recover, they must show some statutory right conferred. States have not infre-

---

**10.** Justice William Brennan of the Supreme Court of the United States explained the concept of constitutional floors in a federal setting, where state constitutions may provide more protections than those afforded by the federal constitution without contravening the federal constitution. *See* William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions As Guardians of Individual Rights,* 61 N.Y.U. L.Rev. 535, 548 (1986).

quently directed the payment of compensation in similar situations. The constitutions of some require that compensation be made for consequential damages to private property resulting from public improvements. Others have, in authorizing specific public improvements, conferred the right to such compensation. Congress had, of course, the power to make like provision here.

*Id.* at 345–46, 45 S.Ct. 293 (citations omitted).

In *Joslin Mfg. Co.*, the issue before the Supreme Court was the validity of statutes authorizing compensation for the condemnation of land, interests, and water rights to provide a pure water supply for a municipality. 262 U.S. at 670, 43 S.Ct. 684. In its opinion, the Supreme Court addressed an equal protection challenge to a statute providing compensation for injury to businesses established prior to notice that the property would be taken but not to those businesses established after notice. *Id.* at 676, 43 S.Ct. 684. The Supreme Court stated:

In respect of the contention that the statute expends the right to recover compensation, so as to include these and other forms of consequential damages, and, thus, deprives plaintiffs in error, as taxpayers of the city, of their property without due process of law, we need say no more than that, while the Legislature was powerless to diminish the constitutional measure of just compensation, we are aware of no rule, which stands in the way of an extension of it, within the limits of equity and justice, so as to include rights otherwise excluded. As

stated by the Supreme Judicial Court of Massachusetts in *Earle v. Commonwealth,* 180 Mass. 579, 583, 63 N.E. 10 (57 L.R.A. 292, 91 Am. St. Rep. 326), speaking through Mr. Justice Holmes, who was then a member of that court:

"Very likely the ... rights were of a kind that might have been damaged if not destroyed without the constitutional necessity of compensation. But some latitude is allowed to the Legislature. It is not forbidden to be just in some cases where it is not required to be by the letter of the paramount law."

*Id.* 676–77, 43 S.Ct. 684.

■■■ As *Mitchell* and *Joslin Mfg. Co.* illustrate, the constitutionally required "just compensation" is a minimum measure that must be paid, not a maximum one. The legislature has the power to provide for more than the minimum "just compensation." Therefore, there is no violation of the Missouri Constitution's provision requiring "just compensation" for land taken for public use by the requirement of additional compensation for heritage value in section 523.039. Article I, section 26 operates as a constitutional minimum, and section 523.039 is an example of the legislature exercising its prerogative to allow additional compensation for a statutorily defined class whose land is subject to taking, i.e., real property owners whose land has been owned by their family for 50 or more years.[11]

■■■■ As a political subdivision of the state government, the county has been delegated the power of eminent domain by the legislature. *State ex rel. Jackson v.*

---

11. In addressing a similar constitutional challenge, the Supreme Court of Kansas held that the Kansas legislature could increase the amount of compensation owed to a party to include payment of a 25 percent premium above fair market value without offending the requirements in the constitutions of the United States and Kansas that require payment of "just compensation." *State ex rel. Tomasic v. Unified Gov't of Wyandotte Cnty.,* 265 Kan. 779, 962 P.2d 543, 560–61 (1998).

*Dolan,* 398 S.W.3d 472, 476 (Mo. banc 2013). As such, the county has "no inherent powers but [is] confined to those expressly delegated by the sovereign and to those powers necessarily implied in the authority to carry out the delegated powers." *Christian Cnty. v. Edward D. Jones & Co., L.P.,* 200 S.W.3d 524, 527 (Mo. banc 2006) (quoting *Premium Standard Farms, Inc. v. Lincoln Township of Putnam Cnty.,* 946 S.W.2d 234, 238 (Mo. banc 1997)). "[T]he State, speaking through its Legislature, may ... impose upon itself, and upon those to whom it delegates the right of eminent domain, an obligation to pay more than what the courts might consider a 'just compensation.'" *Daniels v. State Rd. Dep't.,* 170 So.2d 846, 853 (Fla. 1964).

### B. Heritage Value Statutes Do Not Confer Public Funds for Private Benefit

In its second constitutional challenge to the statute, the county asserts that the payment of heritage value uses public funds to confer an unconstitutional private benefit. Article III, section 38(a) of the Missouri Constitution states:

> The general assembly shall have no power to grant public money or property, or lend or authorize the lending of public credit, to any private person, association or corporation, excepting aid in public calamity, and general laws providing for pensions for the blind, for old age assistance, for aid to dependent or crippled children or the blind, for direct relief, for adjusted compensation, bonus or rehabilitation for discharged members of the armed services of the United States who were bona fide residents of this

state during their service, and for the rehabilitation of other persons.

Accordingly, public funds may be used only for the public interest unless the situation allows for one of the listed exceptions. Article VI, sections 23 and 25 similarly restrict local governments from providing public money for private use.

 Here, the county does not argue that its exercise of eminent domain fails to serve some public purpose. Rather, it argues that any compensation it must pay beyond the constitutional minimum to make that acquisition serves no public purpose and is, therefore, unconstitutional. To determine whether there is a sufficient purpose behind a grant of public money, this Court has employed the "primary effect" test. *Curchin v. Missouri Indus. Dev. Bd.,* 722 S.W.2d 930, 934 (Mo. banc 1987). The "primary effect" test states:

> If the primary object of a public expenditure is to subserve a public municipal purpose, the expenditure is legal, notwithstanding it also involves as an incident an expense, which, standing alone, would not be lawful. But if the primary object is not to subserve a public municipal purpose, but to promote some private end, the expense is illegal, even though it may incidentally serve some public purpose.

*Id.* (quoting *State ex rel. City of Jefferson v. Smith,* 348 Mo. 554, 154 S.W.2d 101, 102 (1941)).

 When considering the statutory compensation in section 523.039 for condemnation of property that has been owned by a family for 50 or more years, the public expenditure is made to acquire, through eminent domain, property for a public purpose.[12] The primary object of

---

**12.** For the purpose of applying the "primary object" test, this Court assumes, without finding, that there is no public purpose in paying property owners additional compensation when the condemned property has been owned by one family 50 or more years.

the expenditure in section 523.039, then, is to compensate a class of persons whose property is acquired through eminent domain for the benefit of the public. Therefore, the compensation authorized by section 523.039 "is legal, notwithstanding that it also involves as, an incident, an expense that, standing alone, would not be lawful." *Curchin,* 722 S.W.2d at 934. Section 523.039 does not violate the constitutional prohibition against using public funds for a private benefit.

### C. Heritage Value Statutes Do Not Invade Jury's Duty to Determine Just Compensation

■ Article I, section 26 of the Missouri Constitution states that the "just compensation" to be paid for the acquisition of land by eminent domain "shall be ascertained by a jury." The county asserts that the heritage value statute violates this section of the constitution because, under section 523.061, it is the judge's responsibility to determine heritage value and not the jury's.[13]

This assertion is incorrect. This argument is based on the county's claim that the language of section 523.060, referencing "just compensation," mandates that all amounts paid under the statute are constitutional compensation that must be ascertained by a jury. As previously determined, article I, section 26 requires the payment of "just compensation," which has been defined by this Court as "fair market value." *Union Quarry,* 394 S.W.2d at 305. The legislature has provided for payment of heritage value compensation in addition to the constitutionally required payment of "fair market value." Because heritage value compensation is not part of the "just compensation" mandated by the constitu-

tion, there is no constitutional mandate that it be ascertained by a jury.

### Conclusion

While numerous parts of the trial transcripts were missing, none of the inaudible words or unrecorded side bars were material to the issues raised on appeal, so the record was sufficient for this Court to rule with confidence. The trial court did not err in its evidentiary rulings, and the verdict was not grossly excessive so as to warrant a new trial.

Furthermore, the trial court did not err in assessing and adding heritage value to the jury's verdict. The statutes providing that persons who have owned their property for 50 or more years, whose property is subject to taking for public use, should be awarded an amount of compensation greater than the fair market value of that property do not violate the Missouri Constitution. Nor does compensation that is above the fair market value, provided in response to a taking, violate the constitution by providing a private benefit with public funds. Lastly, the heritage value statutes do not give the judge the jury's responsibilities in determining just compensation in violation of the constitution. Accordingly, the judgment of the trial court is affirmed.

RUSSELL, C.J., FISCHER, STITH, DRAPER and TEITELMAN, JJ., concur.

WILSON, J., not participating.

---

**13.** The county does not allege that section 532.061 violates its right to a jury trial provided by article I, section 22(a) of the Missouri Constitution.